# Richmond.

## CLUVERIUS v. THE COMMONWEALTH.

### MAY 6th, 1886.

1. CORPORATION COURTS—*Terms.*—Under Code 1873, chapter 154, sec
tions 26 and 36, corporation courts have authority to continue a term
from day to day into the next succeeding month, and to change
accordingly the day for the commencement of the succeeding term.

2. CRIMINAL PROCEEDINGS—*Discharging veniremen*—It is not error in
the trial court to discharge a venireman, who had previously
expressed opinions repugnant to inflicting capital punishment, on
circumstantial evidence ; or who had made a bet on the result of the
trial.

3. IDEM—*Capital cases—Juries.*—*Hall's Case*, 80 Va. 555, approved as to
mode of selecting jury.

4. IDEM—*Examination of witnesses.*—Questions are not leading which
merely direct the witness' attention to the subject as to which he is
questioned, without suggesting the answer.

5. IDEM—*Evidence—Admissibility.*—Where the evidence established
that the deceased left Bath for Richmond on the 12th, assigning as
her reasons for leaving, the contents of a letter then exhibited and
read, and that early on the 14th, she was found dead in Richmond,
under circumstances indicating she had been murdered, that letter
was admissible in evidence for the prosecution, as part of the *res
gestœ*, or of those acts—verbal, or written, or done—which stand in
*causal relation* to the crime.   And so, likewise, a note addressed on
the 13th in the handwriting of the deceased, from Room No. 21 of
the hotel in Richmond, to the accused, under circumstances indica-
ting it was written by the deceased to the accused in answer to a note
addressed to the occupant of that room, is admissible as part of the
*res gestœ*, and also for the purpose of identifying that occupant with
the deceased, and of showing that she was in communication with
him on the day of her death.

6. IDEM—*Indictment—Verdict.*—An indictment in the common law form for murder, charges both degrees of murder, and a verdict finding the accused guilty of murder in the first degree, as charged in the indictment, is sufficient.

7. IDEM—*Presence of accused.*—Where at the end of the record of the proceedings of the court on the day of the conviction, it is stated: "And thereupon the accused was remanded to jail," is conclusive that he had been personally present during all the proceedings had that day.

8. IDEM—*Case at bar.*—A case of circumstantial evidence wherein the verdict of guilty of murder in the first degree, is fully warranted; and wherein the after-discovered evidence would not have justified the trial court in awarding a new trial.

Writ of error to judgment of Hustings court of the city of Richmond, rendered 19th June, 1885, against Thomas J. Cluverius, the plaintiff in error, who was indicted, tried, convicted, and sentenced to be hanged for the murder of Fannie Lillian Madison, on the 13th day of March, 1885, within the jurisdiction of the said city.

The opinion of the court fully states the case.

*W. W. & B. T. Crump, H. R. Pollard,* and *A. B. Evans,* for the plaintiff in error.

*R. A. Ayres, attorney-general, C. V. Meredith,* and *W. R. Aylett,* for the Commonwealth.

FAUNTLEROY, J., delivered the opinion of the court.

The voluminous record in this case presents to the careful, patient and anxious scrutiny of this court, the determination of the legality and justice of the proceeding in the case in the trial court—that is, the question, both, whether the Commonwealth produced upon the trial before the jury, evidence, competent and sufficient, to warrant the verdict of the jury;

and whether the prisoner, from the inception to the end of his trial, has had the benefit of all the sanctions and safeguards thrown around him, and, indeed, around the lives and the liberties of all her citizens, by the criminal jurisprudence of the State?

In this connection it is appropriate to remark the fact, that, from the beginning to the end of the protracted and painful trial of this case in the said Hustings court, extending through thirty days, and embracing so many intricate questions of law and fact, there are no exceptions filed, either to the instructions given by the court to the jury, or to the conduct of the jury, or of the officers of the court.

The record shows that, during the said trial, *eight* bills of exceptions to the rulings of the court were taken by the prisoner; and, also, that a motion in arrest of judgment, for errors manifest on the record, was made by the prisoner, and overruled by the court; and the said rulings of the court, as shown in the several bills of exceptions, and its ruling upon his motion in arrest of judgment, are assigned as errors.

Before we proceed to consider these assignments of error and the grounds of error assigned in the record, we must consider the question raised and relied on here by the learned counsel for the prisoner, in their printed and oral argument at the bar of this court, viz: "That the Hustings court had no authority to hold its session; and hence had no jurisdiction over this case at the time the verdict was rendered and sentence pronounced."

The record shows that the accused was arraigned on the 5th day of *May*, 1885, and, at the same session of the court, continued by adjournment from day to day, the case was submitted to the jury on the 4th day of *June;* on which day they found the accused *guilty.*

It is insisted by the learned counsel for the prisoner, "that the regular monthly term of the Hustings court, for the month

of May, commenced on Monday, the 4th day of May, and expired on Saturday, the 30th day of May—the following Mon-. day being the 1st day of June; and, consequently, that all proceedings thereafter had, are null and void." By Article VI., section fourteen of the Constitution of Virginia, the judges of the corporation or hustings courts are provided for, "who shall hold a corporation or hustings court of said city or town, as often and as many days in each month as may be prescribed by law."

By the twenty-sixth section of chapter 154 of the Code of 1873, it is provided, that "there shall be *a term* of the said Hustings court (of the city of Richmond) for each month in the year, except the month of August, commencing on the first Monday in the month, and *continuing so long as the business before the court may require.*"

By the thirty-sixth section of this chapter it is provided, "the judge of every such corporation court may, from time to time, change the day for the commencement of the terms thereof, or any of them," &c. See also Code 1873, chapter 155, section eighteen. The judge of the Hustings court entered an order in this cause postponing the commencement of the *June* term of the court from the first Monday to the fourth Monday; and then continued the *May term,* by adjournment from day to day, after the first Monday in June, "so long as the business before the court required."

In *Cahoon's Case,* 21 Gratt. 822, this Court, in construing the fourteenth section of the VI. Article of the Constitution of Virginia, says: "The words 'as many days in each month as may be prescribed by law,' in that section, do not refer to the calendar month in which a term may commence, but to the *judicial* month, commencing from the day in one calendar month, and continuing to the day in the next calendar month fixed by law for the commencement of the monthly term of the court."

The record shows that the monthly term of the June term was changed, by the legal order of the judge, to begin on the fourth Monday, instead of the first Monday in June; and we are of opinion that he had the legal right, and was in duty bound, to continue the May term, from day to day, into the month of June, so long as the business before the court required; and, as in this case, the record shows, was indispensably requisite for the conduct of the trial of the prisoner, and to prevent a failure of the ends of justice.

The first bill of exceptions alleges error in the decision of the hustings court upon the challenge for cause by the Commonwealth, of the *venireman*, R. W. Larke, in sustaining the said challenge and discharging the said Larke from service on the jury, after he had been examined by the court upon his *voir dire* and accepted as a juror.

After the said Larke had been examined and accepted by the court as a juror, he was challenged by the Commonwealth, on the ground that he had, before being sworn, stated "that he under no circumstances would hang any man upon circumstantial evidence." The information upon which the challenge was based, came to the knowledge of the attorneys for the Commonwealth after the said Larke had been so accepted. The Commonwealth introduced two witnesses, J. T. Ford and W. A. Boswell, to support its challenge.

J. T. Ford testified as to where the statement was made by Larke, and stated that W. A. Boswell and others were present; and he then said: "We were talking about this case. I said that I could not serve, as I had formed an opinion, or made up my mind. Mr. Larke asked me how I had formed my opinion. And I told him from what I had seen in the newspapers. He said I had no right to form an opinion upon that. I said that was true, but a man could not help forming an opinion after he had read about the evidence. Mr. Larke then said,

that the evidence published was '*nothing but circumstantial evidence.*' I said, yes, but men had been hung on circumstantial evidence. He said, well, '*I would not hang any man on circumstantial evidence.*' He told us of several cases to show that *no man ought to be hung* on circumstantial evidence. I understood him to refer to circumstantial evidence generally; and that he would, *in no case*, hang a man upon circumstantial evidence."

William A. Boswell testified : "They were discussing this case, and talking generally about crime. Mr. Larke mentioned several cases of circumstantial evidence, and said that he would not, under any circumstances, hang a man on circumstantial evidence. He spoke in a general way, &c., &c. I didn't understand him to refer particularly to this case."

The challenged juror, Larke, then stated: " We got to talking about circumstantial evidence, and I narrated some cases to show the danger of convicting a man on circumstantial evidence. I may have made the remark, as stated by Boswell and Ford; and if they say so, I have no doubt I did, for they remember, perhaps, better what I said than I do. I can't remember positively the words. I spoke in a general way, without reference to any particular case. I meant by what I said that a man ought to be very slow and cautious in convicting a man on circumstantial evidence. If this case presented an unbroken chain of circumstantial evidence, fully proved, I would convict him—*if I was convinced.* I don't remember having said that I would under no circumstances hang a man on circumstantial evidence. I didn't intend to say I wouldn't convict a man in any case of circumstantial evidence, but would be very slow and cautious in so doing."

Mr. Larke then said that he was over sixty years of age ; that he had not thought of it when examined on his *voir dire;* that, if not too late, he would claim, and did claim, his legal exemption.

In *Montague's Case*, 10 Gratt. 767, this Court announced it right to examine the action of the lower court on a question of challenge to a juror; but said: "In all cases great weight is justly due to the opinion of a court before whom the jurors are questioned and examined," &c.    The Supreme Court of Texas, in *Mason* v. *The State*, 15 Tex. App. 534, say : "We cannot say that in this action of the court there was any error. It was the duty of the court to see that a jury was impanelled composed of men who were free from all bias for or prejudice against the defendant—who were impartial towards either the State or the defendant.    In determining as to the fitness of a juror, the question is largely one of discretion with the trial-judge.    He has the proposed juror before him; observes his manner of answering questions, his appearance, and many other *indications* which cannot be brought before this court; and hence the trial-judge is in a much better condition to pass upon the fitness of the individual to serve as a juror in the case, than this court can be from the record alone.    Such being the case, this court will not revise such action of the trial-judge, unless it should be made apparent to us that the trial-judge had abused the discretion confided to him to the injury of the of the defendant's rights, or that he had infringed the law." In the case of *Metzger* v. *Starke*, 18 Florida, one Hoke was examined on his *voir dire* (just as Larke was).    After being accepted, he was challenged by the State (as Larke was) and for the same cause.    The affidavits of two parties were introduced, proving that Hoke had made declarations similar to those made by Larke.    Hoke was ordered to stand aside.    He had made no statement tending to contradict the affidavits; but such a difference, between that case and Larke's case, makes a difference only as to the weight of proof—it does not controvert the principle.    In passing upon the point, the Florida Supreme Court said: "One of the best methods of ascertaining

the opinions of men is by the expression of them. If there is any better mode it has not been suggested, &c. The setting aside of the juror in this case was not the mere exercise of power by the judge. Being present and obliged to exercise his judgment on the moment, much should be allowed to his discreet judgment." The lower court was sustained. Another analogous case is that of *State* v. *Ward*, 39 Vermont, 231. One "Prior was called as a juror, who, upon being interrogated in respect to his views of capital punishment, declared he had conscientious scruples against rendering a verdict of guilty in a case where the punishment was death. That he believed the law inflicting the punishment of death was wrong; but that if compelled to sit as a juror in such case, if he was fully satisfied that the respondent was guilty, he would render a verdict of guilty; and that it would require more evidence to induce him to render a verdict of guilty, in a case where the punishment was death, than where it was imprisonment." He was rejected. The court carefully noted the answers of this *venireman*, and held that he was properly rejected; as a trial should "be impartial in respect to the State as well as the accused." · The court said: "Under such circumstances the question whether he should be retained or excused, became, necessarily, a matter of fact for the decision of the county court, which required the exercise of the judgment and discretion of that court, in view of all the statements made by the juror *and evidence bearing upon the question.*"

In the case of *Waller* v. *State*, 40 Ala. 325, a juror who stated, in answer to a question by the court, that he had scruples against capital punishment, was set aside by the court; notwithstanding he stated, in answer to questions by the prisoner, "that if he was on the jury, and the law required him to convict, he would do so, notwithstanding the punishment might be capital." It has been frequently decided that a party who

would not, upon a murder trial, inflict capital punishment, is not a competent juror. *People* v. *Ah Chung,* 54 Cal. 398; *State* v. *Pritchard,* 15 Nev. 74; *Jones* v. *State,* 57 Miss. 684; *Coleman* v. *State,* 59 Miss. 484; *Clanton* v. *State,* 13 Tex. App. 139; 34 La. Ann. 395; 33 La. Ann. 991.

And the first section of chapter 17, Acts 1877–78, p. 341, provides: "A person whose opinions are such as to prevent his convicting anyone of an offence punishable with death, shall not be allowed to serve as a juror on a trial for such offence." The practice in matters of challenge to jurors by the Commonwealth, for cause, has been simplified by the statutes of Virginia; the Commonwealth alleges the cause; evidence on both sides is heard by the court; and the court decides, by a preponderance of evidence, whether the challenge is sustained or not. *See* Crim. Proc. 1878, chapter 17, section 6.

We are of opinion that the Hustings court was, *upon all the evidence before it,* clearly right and fully justified in holding that Larke was not a proper juror in the case; and that the evidence shows, that he not only announced *his belief* that no man should be hung upon circumstantial evidence, but that he argued to support his views against a well settled principle of the law of the State.

Indeed, Larke himself, after being challenged, admitted the ground of the challenge; and, in guarded language, if not paltering in a double sense, only said: "If this case presented an *unbroken chain* · of circumstantial evidence, *fully proved,* I would convict him, *if I was convinced."* (?) The very question at issue was, whether he *could be convinced* by circumstantial evidence, in a capital case; and he himself, intimates that *an* "*unbroken chain,*" "*fully proved,*" might not convince him.

The prosecution and punishment of criminals is vital to the safety of the whole People, and to the peace and dignity of the Commonwealth; and it is the policy of law and the duty

of the courts to see that the interests and honor of the State are not entrusted to jurors *whose opinions* would prevent the administration of criminal justice according to law. Would "the fool (who) hath said in his heart, there is no God," be a fit or competent juror, to be sworn upon the awful sanction of a *Name,* whose very *Being* he impiously denied?—Because he would affirm his capability, nevertheless, of rendering an impartial verdict?

But, even if Mr. Larke had not been disqualified to act as a juror upon this trial, by his proved and admitted opinions, yet the court committed no error in dismissing him. He was over sixty years of age; and, without having been sworn as a juror to try the case, he claimed his legal exemption from jury service; and the court properly permitted him to stand aside.

The second bill of exceptions claims that the Hustings court erred in setting aside the juror, A. S. Goode, who was challenged by the Commonwealth, on the ground that he had "expressed an opinion," and "had made one or two bets upon the result of the trial."

This contention brings the same general question before the court that was involved in the first bill, just disposed of, in the case of the rejected juror, Larke; and may be considered in the light of the same reason and authorities urged and applied in that case. The principle insisted upon in Larke's case, must be repeated and applied to the challenge of the juror, Goode, viz: That great weight should be given to the opinion of the lower court in the exercise of its discretion in examining and deciding upon the fitness and competency of jurors, according to all the evidence before it, for and against the challenge; and that the mere statement of the challenged juror that he is, or considers himself, competent and impartial, will not be allowed to overweigh without consideration, a preponder-

ance of evidence to the contrary. Goode was permitted to make a statement before evidence was heard to support the challenge; and he stated that "he did not remember having expressed an opinion, and did not remember having made a bet." And yet the Commonwealth called *three* witnesses, William Harris, Thomas White, and E. R. Robinson, and proved by them *two* emphatic expressions of opinion and *two* bets, upon the result of the trial of the prisoner, made at different times and places by Goode.

Harris testified: "Mr. Goode said if they did not stop fooling, or something like that, that they would not be able to convict Cluverius. I said I thought he would be convicted; and Mr. Goode replied that *he would not be.* I contended that he would be; and Mr. Goode then said that he would bet me a ten cent cigar that he would not be. I said all right; I'll take that bet. I don't know whether he was joking or not; I considered it a bet; and think I would have to claim the cigar if the prisoner is convicted."

White testified substantially to the above-stated conversation; and said Harris took the bet, &c., &c.

Robinson, testifying to the second expression of opinion by Goode, which took place in Goode's store, said: "There were several parties present. We got *to arguing* the Cluverius case; I maintaining that the prisoner would be convicted; and he *contending that he would not be;*—and he offered to bet me fifty cigars that he would not be convicted. *I took the bet;* and remarked that *I would smoke those cigars yet,*" &c., &c.

It is admitted that the knowledge of this cause of challenge did not come to the Commonwealth until after the juror, Goode, had been examined and accepted. We are of opinion that, irrespective of the character or amount of the wager, the naked fact that a bet, of whatever size, had been made by the juror on the result of the case, should cause his discharge.

This court will not sanction an iniquity so at variance with the purity and sacredness of jury trial, as that a prisoner can be tried for his life by a jury having on it one or more men who have even small bets upon the issue of the trial. Indeed, this is true even in *civil* trials. In *Seaton* v. *Swem*, 58 Iowa, 41, which was a suit to determine the result of an election, one of the jurors had a bet of twenty-five cents upon the election. The Supreme court said: "It is entirely opposed to all our ideas of the impartiality which should characterize judicial proceedings, that controversies between parties should be decided by persons who have made wagers as to the result; that such a thing should be tolerated, is offensive to every notion of justice, &c. Who can say to what extent the desire of a party, who has made a bet, to have his judgment sustained, would influence him when called up to determine from evidence whether the fact accorded with, or was opposed to, his previously expressed opinion as to the result? Ordinarily, one expects what he desires, and bets upon the accomplishment of what he expects. Usually, the mere fact of making a bet indicates a bias."

In *Essex* v. *McPherson*, 64 Illinois, 549, the court said: "For a juror to sit in the trial of a cause upon the result of which he has a wager depending, is a gross impropriety, and offensive to the sense of justice."

The hustings court did not err in rejecting Goode; the ground of his exclusion having been clearly proved by the evidence before the court in support of the challenge, and found to be neither "vague, uncertain, nor irrelevant,"—but distinct, positive and relevant.

III. The *third* bill of exceptions is taken to the method of impanelling the jury. The court proceeded to examine the *veniremen* summoned under the several successive writs of *venire facias*, until (after the examination of over nine hundred)

sixteen persons, free from exception and qualified by law, had been selected and directed to take their places upon the panel; and the list of these sixteen was submitted to the accused in order that he might strike off four names, the remaining twelve to constitute the jury for his trial. It was insisted by the accused, that the court should proceed with the examination of the *veniremen,* upon their *voir dire,* until *twenty-four* persons, free from exception, had been obtained; that sixteen should be selected, in some manner, from the twenty-four, and then the list of sixteen *thus obtained* submitted to the accused.

The court overruled this objection, and the prisoner excepted.

In this exception there is no merit. The court proceeded in strict conformity with the law, as it has been clearly expounded and decided by this Court in the recent cases of *Hall* v. *Commonwealth,* 80 Va. 555; *Richards' Case, ante,* p. 110; *Honesty's Case, ante,* p. 283.

IV. The fourth bill of exceptions is taken to the action of the court in permitting certain questions to be propounded to the witness, A. W. Archer, which questions are set forth in the bill, and alleged to be "leading."

It is not permissible for *three* separate and distinct rulings of the court to be objected to in one bill. Each ruling must be the subject of a separate bill; each objection must stand on its own merits. A bill of exceptions is required to be a specific and definite allegation of error;—not a jungle of objections. *Harman* v. *City of Lynchburg,* 33 Gratt. 37. Here the bill of exceptions sets forth objections as being to two questions, alleged to be *leading,* which were asked at different times; and to the refusal of the court to strike out "each and every question and answer propounded to and given by this witness, as being illegal and irrelevant."

But a critical notice of the two questions objected to, will show that they were not *leading,* or otherwise improper ques-

tions; and that both the questions and the answers to them, were legal and relevant.

Before either of the said questions was put to the witness, Archer, he had testified that he had had an interview and a conversation with the prisoner at the jail, but that he did not remember the details of the conversation; and both the court and the attorney for the Commonwealth had endeavored to get the witness to narrate the conversation, and had failed. Then the first of the said questions were put: "Do you remember whether in the jail you asked him if he had ever seen you before?" The other question objected to reads as follows: " Do you remember whether at the jail you had any conversation with him, or not, about when he had last seen Miss Madison?" These questions are not leading, but are merely introductory; they are as indefinite in form as possible under the circumstances, and they ask no information as to what the prisoner had said.

What are leading questions? "It should never be forgotten that *leading* is a relative, not an absolute term. There is no such thing as *leading*, in the abstract; for the identical form of question which would be *leading*, of the grossest kind, in one case or state of facts, might be not only unobjectionable, but the very fittest mode of interrogation in another." Best on Evid. 1 American Edition, 2 vol., sec. 641; 2 Phil. Evid., 5 American Edition, p. 745, note 575.

"In cases of conversations, admissions, and agreements, you may draw the witness' attention to the *subject*, occasion, time, place, person, and ask directly whether such person said anything on the subject thus brought under his attention; and if answered, yes, then what did he say?" 2 Phil. on Evid. 5 Amer. Ed., page 747, note 575.

"A question is objectionable, *as leading*, when it suggests the answer; not when it merely directs the attention of the witness

to the subject respecting which he is questioned," &c., &c. "A witness who deposes to a conversation with the accused, may, after having first exhausted his memory in answering the question 'what took place at it?' be further asked *whether anything was said on such a subject, i. e.*, on the subject matter of the indictment." Best on Evidence, 1 Amer. Ed., section 641.

Tested by this rule and these authorities, the questions objected to were perfectly proper; being put to a witness who had deposed to a conversation with the prisoner, but who had stated his inability of memory as to the details of the conversation; and being intended only to draw the attention of the witness to certain subjects discussed in the conversation; and in so doing, the questions are confined to what the witness may have said, and not the prisoner.

The fourth bill of exceptions presents no ground for reversal.

V. The fifth bill of exceptions is taken to the alleged error of the court in allowing to be read to the jury as evidence a certain letter purporting to have been written to Fannie Lillian Madison, the deceased, by Miss Laura M. Curtis.

Before this "Curtis letter" was admitted by the court, evidence (as the record shows) had been offered to prove the death of Fannie Lillian Madison, by drowning, preceded by at least partial insensibility. That her hat, shawl, veil, gloves, and a cloth satchel of clothing had been so scattered in different places within the city, between the hours of eight and a half o'clock P. M., of March 13, and seven o'clock A. M., on March 14, when her dead body was found, as to make it unreasonable to suppose that she had committed *suicide;* that the marks upon her face and hands, and her general appearance, showed that she had been first struck on the head by some person, and then thrown into the water; that she had not been in the water over twelve hours, if so long; and that she was eight

months' pregnant with child; and evidence had been offered to prove that the prisoner had had an opportunity to seduce her—a young unmarried woman.

It had also been proved, that she had gone to Mrs. Margaret A. Dickinson's, in Bath county, Virginia, in October, 1884, as a teacher; that she had left there on January 5, 1885, under a pretext, that her aunt, Mrs. Jane F. Tunstall (who lived in King and Queen county, and with whom the prisoner lived), was not expected to live; telling Mrs. Dickinson, "Poor Aunt Jane isn't expected to live," and saying that she "would like to see her once more;" and saying, in reply to Mrs. Dickinson's remark, that it was a right long trip for her alone," "Cousin Tommie wrote me he would meet in Richmond;" and the next morning, when about to start, "Oh! Cousin Tommy will meet me;" and, when she returned on January 8, in reply to Mrs. Dickinson's question, "Miss Lillie, did any one meet you in Richmond?"—"Cousin Tommie Cluverius met me in Richmond and brought me back;" that she returned to Bath county on the evening of the 7th; that on the 6th of January she was at the Exchange Hotel, in.Richmond, registered in her own handwriting under the name of "*Miss F. L. Merton*," and occupying *Room* 66; that the prisoner, who lived in King and Queen county, came into the Exchange Hotel on the morning of the 6th, and walked up to the clerk's counter, and, running his finger down the list of names on the register, fixed it upon the entry "Miss F. L. Merton, 66," and asked *if this lady is in?* That the prisoner was in the hotel several times during that day in conversation with the deceased, who had registered herself as "Miss F. L. Merton," and who was the occupant of Room 66; that he left the hotel with her that evening; and that she did not return that night at all, and not until the next morning, the 7th, when she shortly afterwards went away.

The Commonwealth offered to introduce *the letter* after proving that it was the one received by the deceased on March 10, from the postoffice. Its introduction was objected to by the prisoner; the court took time to consider; but, before the court passed upon its introduction, the prisoner's counsel asked the witness, Mrs. Dickinson, "what was the date that you have mentioned being the day on which this letter, about which there has been so much argument, and which was offered to you for identification, was received, *and which she exhibited as a reason for her coming to Richmond?*" The witness answered "*March* 10." Afterwards the Commonwealth pressed the point, thus asserted, and brought out in evidence *by the defence*, that *the letter* was the inducement of her coming to Richmond; and fully proved that she asserted that the contents of the letter were the cause of her coming to Richmond on March 12; and that she exhibited the letter and read its contents to Mrs. Dickinson as such inducement, and asked what she should do; and, upon Mrs. Dickinson's consenting to her coming, determined to come, and did come, starting off to come the next morning.

The evidence having established that the deceased was living in Bath county at Mrs. Dickinson's as a teacher, and that she left there on March 12th for Richmond, assigning, as the reason for her leaving, the contents of a letter at the time that she exhibited and read the same; and, having established that, she did come to Richmond and was found dead here early on the morning of the 14th, under circumstances and surroundings which powerfully, if not, indeed, palpably, indicated that she had been *murdered*; the letter was legitimate proof as part of the *res gestæ*, or of those acts—verbal, or written, or done—which stand in "*causal relation*" to the crime. It was the avowed hinge and *preparation* for her coming; it was *illustrative* of her motive and act of coming; it "characterized her act

of going," and it was one of the "*immediate accompaniments*" of the act; she having declared it as her reason for going, and actually started to go as soon as she possibly could—the next morning—to Richmond; where she arrived and registered at the American Hotel about 3 A. M. on the morning of the 13th March, under the same assumed name of "Miss F. L. Merton," and was assigned to "Room 21." At about between 10 and 11 o'clock A. M. of that day, March 13th, while the deceased (who was thus registered and assigned to Room 21 at the American Hotel, under the name of "Miss F. L. Merton, Virginia") was eating her breakfast, a letter or note was brought to the American Hotel, by a colored boy, and received by the clerk, Joseph H. Dodson, and was given by him immediately to the office man (or office *boy*), Hunter Hunt, to take to "*Room* 21," which Hunt did deliver to the lady in 21 (whom he found eating her breakfast) and asked her if there was any answer. She gave him an answer in a sealed envelope (he standing waiting in the hall at her door while she wrote it) addressed to "*T. J. Cluverius*," which Hunt took to the office and gave to the colored boy who had brought the note or letter to the Hotel and given to the clerk, and which the clerk had sent to the occupant of Room 21. The contents of the note thus addressed to T. J. Cluverius by the lady in Room 21, responsive to the letter or note which she had just received, was, "I will be there as soon as possible, so do wait for me;" and it is in proof, by many witnesses, that she, having soon thereafter left the Hotel, was *seen with the prisoner* on the bridge leading to Belle Isle and in the workshops on Belle Isle, and was heard to accost him, in reply to something that he had said to her, "*Why, Cousin Tommie!*"

This narrative of so much of the transaction between the deceased and the prisoner, which followed in immediate sequence to, and consequence of, her reception of the "Curtis letter" in

Bath on March 10th, and of her showing it and reading it to Mrs. Dickinson as her reason for her coming the next day (though she missed the train on the 11th) to Richmond, where she is in close communication with the prisoner on the next morning, after her arrival in the night, and in different parts of the city with him; who visits her at the American Hotel, registered by the same assumed name which *she* and *he* had both used on previous occasions of clandestine meeting, is given to show the connection of the prisoner with the Curtis letter— even in anticipation of the subsequent evidence which proves his instigation of and privity with it—as a second deception practiced upon Mrs. Dickinson, and as a means and cause of getting the girl to leave her home in Bath and to come to Richmond. *Wharton's Law of Evidence, section* 258, says: The area of events covered by the term *res gestæ* depends upon the circumstances of each particular case." In section 261, the author says: " Yet, again, must it be remembered that continuousness is not always to be measured by time. A transaction, in which parties are absorbed, may last for weeks, so as to make, as has just been said, what is said and done in connection with it part of the *res gestæ*, &c., &c.; that, if there be connecting circumstances, a declaration may, even at a month's interval, form part of the *res gestæ.*" "It is in any view clear that declarations which are the immediate accompaniments of an act, are admissible as part of the *res gestæ, remembering that immediateness is tested by closeness, not of time,* but by causal relation, as just explained." *Ibid,* section 262.

" When an act is done to which it is necessary or important to ascribe a character, motive or object, what was said by the actor at the time, from which the character, motive or cause may be collected, is part of the *res gestæ*—verbal acts—and may be given in evidence, whether the actor be, or be not, a party to the suit." Greenleaf on Evidence, 16th Edition, vol. 1, sec. 108, note B. See also, Taylor on Evidence, vol. 1, sec. 584.

Section 588 (of same) is as follows: "In all these cases the principal points of attention are, whether the circumstances and declaration offered in proof were so connected with the main fact under consideration as to illustrate its character, to further its object, or to form, in conjunction with it, one continuous transaction. It was, at one time, thought necessary that they should be contemporaneous with it, but this doctrine has of late years been rejected; and it seems now to be decided that, although concurrence of time must always be considered as material evidence to show the connection, it is by no means *essential*. Thus, in *Ridley* v. *Gyde*, when the disputed act of bankruptcy was a fraudulent transaction, a declaration by the bankrupt in which he gave a *false* account of the matter, was received in evidence, though made nearly a month after the transfer had taken place." "Verbal and written declarations are often said to be admissible as constituting a part of the *res gestæ*." Phil. on Evidence, p. 185; *Hayden's Case*, 9th Reporter, 237.

The mere lapse of time does not affect the *res gestæ*. See *Little's Case*, 25 Gratt. 921, and *Jordan's Case*, Ibid. 943. See also Greenleaf on Evidence, vol. 1, sec. 108, note I, p. 145.

In *Hadley* v. *Carter*, 8 N. Hamp. 40, it appears that the servant made his statement (of the reasons of his going) one night, and on the next morning he was gone. Miss Madison made her statement of reason, object, purpose of going, on the evening of March 10th, and started off the next day as soon as she could. If she had merely repeated to Mrs. Dickinson the contents of the letter (without mentioning or exhibiting the letter) as her reason for coming to Richmond, the Commonwealth could, undoubtedly, have introduced her statement as a part of the *res gestæ*—to "characterize her act of going"—having shown that she started as soon as she could, and came to Richmond. But, as the case stood, it was abso-

lutely necessary to introduce the letter, as being the best evidence, and in the possession of the Commonwealth, to prove the inducement declared to Mrs. Dickinson for her coming to Richmond. The letter was admitted by the court, not as the statement of its ostensible author, Miss Curtis, and not whether true or false, but as the declaration of the deceased preparatory to her coming, and as the reason for her coming to Richmond; where she did come immediately—to her death. It was never attempted to prove the truth of the statements or contents of the letter—it was wholly immaterial to the object of its introduction, whether it were true or false. Its exclusion because it was false and a forgery, or "produced by the calculated policy of the actors," would only be as against its introduction by and for the prisoner.

"Evidence of preparation is always admissible *for the prosecution,* &c. Under the same head fall cases where the evidence shows a repairing to the spot destined to be the scene of crime; and acts done with the view of paving the way to the guilty enterprise." (Wharton's Crim. Evid. sec. 753.) "In the same connection may be noticed *false* representations as to the state of another person's health, with the intention of preparing the relatives for the event of sudden death, and to diminish the surprise and alarm which attend its occurrence; and letters addressed to the writer by himself for the purpose of diverting suspicion." *Ibid,* sec. 754.

The mere fact that the reason given for leaving was a forgery and a premeditated falsehood, does not render the letter inadmissible *for the prosecution.* As testimony *for the defence* it would be inadmissible, because it was prepared for a defence. "Statements concocted in advance, as part of a scheme of crime, are clearly not within the exception. Such statements are inadmissible as *self-serving,* and cánnot, therefore, be introduced by the defendants on their own behalf; they may be put in

evidence, however, *by the prosecution*, when the object is to prove premeditation and preparation on the part of the defendants." (Wharton's Crim. Evid. sec. 268.)

The record shows that no objection was made to the questions to and answers from Mrs. Dickinson as to the receipt of the letter; and that it was the question of the defence to the witness, Mrs. Dickinson, which brought out the fact that it was the letter which brought the deceased to Richmond; and this being put in evidence by the defence, the prosecution had the right, outside of the principle of *res gestæ*, to read the contents of the letter which it was thus proved had brought her to the scene of her death.

The rule is, that although evidence, when admitted, may be inadmissible; yet if the evidence subsequently introduced makes the original evidence material and proper, then whatever error was made, in first admitting it, is removed. 1 Bishop's Crim. Pro., section 966 *b*; *Eastman* v. *Company*, 44 N. Hamp. 143; *Scott* v. *The State*, 30 Ala. 503; 1 Dana, page 7; *Rucker* v. *Hamilton*, 3 Dana, pages 36–41; *Bunting* v. *Allen*, 18 N. J. L., page 299.

This court has recognized the right to look to the whole record to determine whether any reversible error has been committed by letting in improper testimony. *Gerst* v. *Jones*, 32 Gratt. 518–529.

The prisoner knew the assumed name under which the deceased girl registered at the Exchange Hotel January 5, 1885, and at the American Hotel, March 12, 1885. They were together at both times and places, in Richmond. The girl was enabled to get Mrs. Dickinson's consent to her coming to Richmond in January, by the first conspiracy with the prisoner to deceive Mrs. Dickinson.

On March the 10th she received, through the postoffice in Bath, the "Laura Curtis letter"—a forgery—written by herself.

It contained a letter and a note, and was in a *white* envelope. It was proved that the prisoner sent to her, through the post-office, a *thick* letter, in a *white* envelope, from King and Queen county, a few days before she received the one on March 10. The prisoner came to ·Richmond on March 12, the day on which the Curtis letter told her to come. She again registered under the same assumed name—the very name, "Merton," that the prisoner had been proved to have assumed; and the first person with whom she gets into communication, and that before she had finished her breakfast, is the person who knew—and, so far as the record shows, the only person who knew—the false name she assumed in Richmond; and that person was the prisoner. She was seen with the prisoner that morning and during the day; and she was seen with no one else that morning. When asking for her at the American Hotel, on the night of the 13th March, the prisoner used to the hotel office boy an expression born of the *Curtis letter*, and showing his acquaintance with *the scheme of the said letter*, which was to produce the impression that *he* was the brother of Miss Curtis—the ostensible writer of the letter—whom the letter asserted would call on Miss Madison, the deceased. The letter was admissible, as one of the acts and facts of the dead girl, just as the fact of her *satchel*, her hat, shawl, gloves, or her declaration to the conductor on the railroad *en route* to Richmond; even though the evidence did not (as it most powerfully and convincingly does) tend to trace it home to him and prove that he remailed it back to her, for the purpose and as the means of getting her to Richmond; and that she came by reason of it. This will more fully appear in the discussion of the seventh bill of exceptions. In the record it appears that the prisoner put in evidence a virtual copy of the Curtis letter; and that he also introduced a letter from Miss Madison, the dead girl, to Miss Williams, which contains the substance of the Curtis letter;

and, by so doing, he must be regarded as having waived, or cured, all objection to its former introduction, and relieved the court of the error, if there was error.

The decision of the hustings court in admitting the letter to be read, was in accordance with the principle of *res gestæ*, and was right; and, even though it were inadmissible when admitted, it was made admissible by the subsequent testimony by the Commonwealth, and by the testimony offered by the prisoner, withal.

VI. The sixth bill of exception presents the objection made to the admission of a certain note in the handwriting of the dead girl, and addressed to the prisoner—spoken of in the record as the "*torn note.*" In discussing the "Curtis letter," as questioned in the *fifth* bill of exceptions, very much of the evidence germane to the identification and admissibility of this "torn note," and the various and leading authorities bearing upon the doctrine of *res gestæ,* have been cited and elaborately commented on; yet, in giving due consideration to the subject of this "torn note," as an essential link in the chain of circumstantial evidence upon which the verdict of guilty and the judgment of the court are based, much repetition will be unavoidable.

On March 13th, 1885, about 11 o'clock A. M., a small colored boy brought a note to the American Hotel for the occupant of "Room 21." The occupant of "Room 21" was *Fannie Lillian Madison* (the deceased), who was registered, by her own handwriting, as "*Miss F. L. Merton.*" The said note was handed to the clerk (Dodson), who gave it to the office waiter (Hunt), telling him to take it to the lady in "Room 21." Hunt took the note up to Room 21, gave it to Miss Madison, the occupant of Room 21, and waited while she read it and wrote a reply, which he received from her in a sealed envelope, directed to *T. J. Cluverius*, and carried it down to the office of the hotel, and

gave it to the boy who had brought the note to which it was a reply. The boy went out with it, but returned with it in about five minutes, saying that he could not find the gentleman, and gave it to the clerk, Mr. Joseph Dodson. The sealing of the envelope had not been disturbed. Mr. Dodson put the note on the hotel counter, or desk, where it remained until Saturday night, when Mr. Dodson, reading the name on the envelope as "T. J. Clemmens," and looking in the directory for that name, but not finding it, and the occupant of "Room 21" having left the Hotel, without paying her bill, tore the note up and cast the scraps into the waste basket. On Monday he spoke about the note, and looked into the waste basket for the scraps, at the request of Detective John Wren, to whom he gave them as soon as he found them. Both Hunt and Dodson swore that the note which Hunt gave to the boy was in a cream colored envelope. Hunt swore that the envelope offered in evidence was the same one that he gave to the boy. Both Dodson and Hunt swore that the envelope offered in evidence was the same one that the boy brought back in five or six minutes. The handwriting of the note and on the envelope was proved to be that of Miss Madison, the occupant of "Room 21." The words of the note were: "I will be there as soon as possible so do wait for me." She left the Hotel in a few minutes after she sent the note—doing as she said she would do, in the note directed to T. J. Cluverius, in response to the one which had been delivered to her in "Room 21." In about an hour afterwards she is seen with the prisoner, T. J. Cluverius, in a distant part of the city. When she returned to the Hotel, she asked for the note; thus showing that she had learned that it had not been delivered to *T. J. Cluverius*, to whom it was directed, and with whom she had been since she hurriedly left the Hotel soon after 11 o'clock that morning, "to be there as soon as possible." From whom could she, by any conceivable

possibility, have learned the fact that the note *which she had directed to T. J. Cluverius* had not been delivered to or received by T. J. Cluverius, except *T. J. Cluverius himself?* Thus is the "torn note" fully and unmistakably identified, not only by the positive, direct testimony of Hunt, but by the corroborative evidence of the handwriting and the significant action of the hapless woman herself, so soon to be the victim of a most foul and dastardly murder, at the hands of the person whom she was—all unconsciously—thus connecting with the "*torn note,*" and branding with this *badge* of his brutal and cowardly crime!

The small colored boy who received the note from Hunt, in the office of the Hotel, and, after an absence of a few minutes, brought it back to the Hotel and gave it to Dodson, the clerk, has never been found by the utmost diligence of the Commonwealth to find him and to produce him on the trial; but his evidence is not indispensable to the Commonwealth, as his testimony would only be cumulative to the fact, fully proved by the witnesses, Dodson and Hunt. Who so likely to be able to recognize him, or to know his whereabouts, as the prisoner, who had selected and made use of him? The facts in this case are widely and essentially different from those upon which the opinion of the court is based in the case of *Mitchell* v. *State,* 71 Ga.—cited by the counsel for the prisoner. The "*torn note*" was admissible as a part of the *res gestæ;* as a silent admission; as proof that the prisoner and the girl, Fannie Lillian Madison, were in communication and were together that day; and to identify the occupant of "Room 21" as Fannie Lillian Madison, the dead girl.

The hustings court admitted it generally. The objection to its admission was a general one. The prisoner did not pray the court to instruct the jury as to what questions in the case it was proper evidence, and as to which it was improper. The rule is laid down in Taylor on Evidence, vol. 2, pp. 1157–8, sec.

1881. * * * "Where evidence is offered for a *particular purpose*, if the judge pronounces in favor of its general admissiblity in the cause, the court will support his decision, provided, the evidence be admissible *for any purpose*." In Greenleaf on Evidence, 14 ed., vol. I, sec. 108, the author says: "So, also, where a person, &c., leaves his home, &c., his declarations made at the time of the transaction, and expressive of its character, motive and object, are regarded as '*verbal acts*,' indicating a present purpose and intention; and are, therefore, admitted in proof like any other material fact." The "*torn note*" was written by the occupant of "Room 21" when she was about to leave, most hurriedly, the Hotel, and but a few moments before she did leave, at the summons of the prisoner, to meet him on the day on which she was found dead. It marks the time and manner of her meeting the prisoner—both of them strangers— here in Richmond at the same time. It declares her intention to get into his company, and to "be there as soon as possible;" and it shows why she left the Hotel a few moments afterward. It characterized her act of going; and as she did go a few minutes afterwards, according to her declared purpose, it was legitimate evidence. See *Hayden's Case*, 9 Reporter, p. 27; *Hunter* v. *State*, 40 N. J. Law, 495. In this last mentioned case the Supreme Court of New Jersey say: "There are few problems involved in the law of evidence more unsolved than what things are to be embraced in those occurrences that are designated in the law as the *res gestæ*, &c. This result has grown out of the difficulty of applying, with anything like precision, *general rules* to a class of cases of infinite variety." In the well considered case of *Lund and Wife* v. *Inhabitants of Tyngsburgh*, 9 Cash. 42, it is said: "The *res gestæ* are different in different cases; and it is, perhaps, not possible to frame any definition which would embrace all the various cases which may arise in practice. It is for the judicial mind to determine, upon such

principles and tests as are established by the law and evidence, what facts and circumstances, in particular cases, come within the import of the terms."

The authorities cited in the petition for the prisoner—*Payne's Case,* 31 Gratt. 855, and *Smith* v. *Shoemaker,* 17 Wall.—do not touch upon the doctrine of *res gestæ.* They were decided upon the question as to how far a letter to a party may be received as a *silent admission.* There are in this case under review many *circumstances* to overcome or obviate the objection which prevailed in *Payne's Case* and in *Smith* v. *Shoemaker.* The note was a reply to a note sent to the occupant of "Room 21." Who sent the note to her? She had only reached the Hotel a few hours before, and had not left the Hotel nor seen anyone; she was registered under an assumed name—the same which she had used and registered by at the Exchange Hotel in January, when the prisoner put his finger upon her assumed name, "Miss F. L. Merton," on the register, and asked to see her, she having come to Richmond from her home in Bath county by reason of a letter from him. This assumed name of "*Merton,*" used by her on both visits, was the one assumed by the prisoner himself on a former occasion. The evidence shows that she, his cousin, was not far from the time of delivery of a bastard, of which the evidence strongly tends to show he was the father; that he was in the city and in the immediate neighborhood of the American Hotel about the time that the note was sent to her, to which she sent a reply—the "torn note;" that, in a few moments afterwards, she left the Hotel and was with the prisoner in a distant part of the city; that upon her return to the Hotel, a short time after she had been with the prisoner, she asked for the note. These facts "obviate the manifest soundness of the objection" which prevailed in *Payne's Case* and in *Smith* v. *Shoemaker.* The State had the right to use the "*torn note*" as evidence to prove that the prisoner and his victim

were in communication and were together on the day of her death. The note was one of the links in the chain of proof; it was surrounded and entwined with all the circumstances set forth in the evidence, and it was admissible as a part of the proof of intercourse between the prisoner and the dead girl. It was admissible to prove that the occupant of "Room 21," at the American Hotel, was Fannie Lillian Madison—the dead girl. The note was written by the occupant of "Room 21;" it was proved to be the handwriting of Miss Fannie L. Madison; hence the State had a right to introduce it to prove that the occupant of "Room 21"—"Miss F. L. Merton"—was *Fannie Lillian Madison*. Being admissible *for that purpose*, the general objection that was made to it cannot prevail. If the prisoner desired the use, to which it would be operated after it was introduced, to be limited merely to the question of *identity*, he should have so prayed. Not having done so, it is now too late. *See* Taylor on Evidence, vol. 2, pp. 1157–58, and sec. 1881.

VII. The seventh exception presents the question, whether the Commonwealth produced sufficient evidence to warrant the verdict found by the jury, and to justify the judgment of the judge who presided at the trial, saw and heard the witnesses, approved the verdict, and refused to grant the prisoner a new trial.

The record, most voluminous as it is, contains a *certificate of the evidence only*, and hence, the *facts proved* not being certified, the appellate court can consider only the evidence introduced by the Commonwealth, and will not reverse the judgment, unless *that evidence*, admitted to be true, is *"plainly insufficient"* to warrant the verdict of the jury. "Where the evidence consists of circumstances and presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. To warrant a new trial in such cases the evidence should be plainly insufficient to warrant

the finding of the jury.    This restriction applies *a fortiori* to
an appellate court.    For, in the appellate court, there is, super-
added to the weight *which must be given to the verdict of a jury
fairly rendered,* that of the opinion of the judge who presided
at the trial, which is always entitled to peculiar respect upon
the question of a new trial.    A new trial, asked on the ground
that the verdict is contrary to evidence, ought to be granted
only in a case of plain deviation from right and justice; and
this court will set aside a verdict, on such a motion, *only* in a
case where the jury have plainly decided against the evidence,
or without evidence.    *Dean's Case,* 32 Gratt.; citing *Reed's
Case,* 22 Gratt., and cases there cited; *Gimmi* v. *Cullen,* 20
Gratt., and cases there cited; *Blosser* v. *Harshbarger,* 21 Gratt.,
and cases there cited.

In *Lawrence's Case,* 30 Gratt., Moncure, P., Christian, Staples,
and Burks, J.'s, concurring, said: "We are of opinion that,
while we would probably have given a verdict of *not guilty,* if
we had been upon the jury, or set aside the verdict which was
given and granted a new trial, if we had presided at the trial,
yet it is not a case in which this court can properly reverse
the judgment for any supposed error therein, in that respect,
as will appear by reference to *Reed's Case,* 22 Gratt. 924, and
the cases therein referred to and commented on."

In *Dean's Case,* 32 Gratt., Judge Christian, speaking for the
court, said: "Circumstantial evidence must always be scanned
with great caution, and can never justify a verdict of guilty,
especially of murder in the first degree—the penalty of which
is death—unless the circumstances proved are of such a char-
acter and tendency as to produce upon a fair and unprejudiced
mind a moral conviction of the guilt of the accused beyond all
reasonable doubt.    *    But it must also be remembered that there
are some crimes committed with such secrecy that to require
the production of a witness who saw the act committed would

be to defeat public justice, to deny all protection to society, to let the greatest offenders go free, and the most heinous crimes go unpunished. No direct evidence can ever be produced in a case like this, where the assassination is secret, and where no human eye, not even that of the unhappy victim, could see the hidden foe. Of necessity, and from the very nature of the case, such a fact can only be proved by circumstantial evidence."

The error assigned in this seventh bill of exceptions presents two specific points of essential inquiry: First, whether the *corpus delicti* is established by the testimony in the case; and, second, whether the evidence sufficiently proves *the prisoner* to be the *guilty agent* of the murder of the deceased?

There is in this record ample proof, outside of that which connects the prisoner with the case, to prove that *Fannie Lillian Madison*, whose dead body was found immersed in the water in the Old Reservoir, in the suburbs, but within the city limits of Richmond, on Saturday, March 14th, about seven o'clock A. M., came to her death by the criminal agency of another—that she was murdered; that she did not commit *suicide.*

On the 14th of March, 1885, about seven o'clock A. M., the superintendent of the Old Reservoir, L. W. Rose, walking around on top of the southern embankment, sees a lady's glove (garnet colored) and a piece of shoestring lying on the ground in front of him, which was furrowed up with broken tracks, which extended across the walkway—the glove and shoestring lying about the centre of the furrowed ground—and looked to him like there had been a scuffle. The walkway was of crushed particles of granite on a clay basis, and was somewhat soft from rain; and at and around where the glove and shoestring lay, the ground was furrowed up with broken tracks all huddled up together and run into one another. Next to the water,

on the embankment, is a fence with sharp pickets, three feet four inches high, surrounding the reservoir; close to this fence he saw, particularly, a woman's foot prints, and back of hers a man's. He looked over this picket fence into the reservoir and saw floating near the top of the water, just opposite to the disturbed ground, a flounce or part of a woman's dress. He called one of his assistants, *R. G. Lucas*, who was repairing the stop-valve below, to come up on the embankment. Lucas saw a glove and piece of shoestring lying on the embankment, where it looked to him *there had been a desperate struggle.* He saw right opposite, in the water, something like a dress; raised it with a pole fourteen feet long, saw a leg and knew there was a body. He didn't measure the tracks; they seemed to be the tracks of a man and a lady. He saw on the embankment opposite where the body was found several tracks of a man and several of a woman. He knew that the picket gate in the picket fence around the water, which was the only one in the fence, and was difficult to distinguish from the fence, was shut that morning. Rose, the superintendent, and Lucas both saw that this gate in the picket fence was shut. Rose testified that it would not stay shut unless it was fastened by a latch or bolt on the outside, and that it was thirty-five or forty feet to the east of where the body was found in the water opposite to the furrowed ground in the walkway on the embankment. The tracks looked fresh, and he is sure that he walked around the night before, as was his custom to do, twice a day. The water runs out of the reservoir on the eastern side, and if there was any current in the water it could not be towards the west, but would be toward the east. The reservoir is surrounded by an outside plank fence, up and down, eight feet high, enclosing about six acres, and the gates are generally closed at night. On the south-side of the grounds there is no gate; but there was a hole in the fence near the southeast corner, made by

one or two planks having come off and one or two others hanging loose on the nails at the top, just opposite the small-pox burying-ground, in the Clark's Spring property, which joins the reservoir grounds on the east.   Rose went in for the coroner (Taylor), who reached there about ten o'clock A. M., and Rose gave to him the glove and the shoestring, which Taylor, the coroner, says he saw lying in the midst of this trampled ground, and which he identified in his evidence before the jury.   No strangers were on the embankment when he returned from notifying the coroner, about nine o'clock A. M.

The coroner, Dr. W. H. Taylor, noticed many tracks of a female, and two, large broad-heel tracks, as if of a person look-ing into the reservoir.   He had the body taken out, and it was found to be the body of a young woman, who had been dead at least six hours, how much longer he could not tell.   The hands were tightly clenched, with lumps of mud in them.   On the inside of the left arm of her Jersey was a small tear, and around the bottom of her dress were a few small, round holes. Her clothing had no name upon them.   Her hair was neatly done up.   Her height was four feet eleven inches—only nine-teen inches higher than the picket fence with sharp points. She had the mark of a blow on the upper and outer side of the right eye, but no abrasion of the skin, while the left side of her lower lip was bruised "by a slight blow or pressure—but *more probably pressure."*   On her forehead were a few slight abrasions of the skin.   The *post mortem* examination revealed a blush of blood upon the brain, attributed by the coroner to a counter-stroke from the blow over the eye.   She died from "drowning, preceded, perhaps, by partial insensibility, which prevented her from swallowing more water."   She was eight months gone with child, and hence more liable to be rendered insensi-ble by a blow.   Her shoe fitted the female tracks upon the embankment.   Mr. Jackson Bolton, assistant city engineer,

Mr. A. W. Hargrove who went out to the reservoir with Mr. Bolton, and Messrs, Trainham and Hutcheson who were working under the witness, Lucas, that morning, prove the existence of fresh tracks from the hole in the fence and running diagonally across the ground to the embankment and up the embankment towards that part of it where the furrowed ground was, just opposite where the body was found in the water. They were the tracks of a male and female walking side by side. The man's tracks are described by the different witnesses as "a medium size track—a tolerable good size track; it was a right broad track—broad bottomed shoe, with broad heel—looked like a kind of a coarse shoe—saw no print of nails in the tracks; man's tracks were very flat, and had a flat, broad heel, the whole impression that of a flat, broad shoe—a brogan or flat shoe—the impression of the heel was· very little more than the rest of the foot." The other glove and the veil of the dead girl were found outside of the hole in the fence, between the fence and the small-pox burying-ground. Her hat was found in the old house on the Clark Spring property where the dead small-pox patients used to be put—about seventy-five yards northeast of the hole in the fence, towards Ashland street. The hat had a little red lint on it, and some gravel or sand in it. Her red shawl was found by Mr. Dunstan, about six o'clock on the morning of March 14th, hanging on his front fence, on Reservoir street, about half a mile north of the reservoir. Reservoir street runs from Ashland street—the northern boundary of the Old Reservoir—to Main street at the point where the street cars stop. Her canvas satchel, containing several articles of wearing apparel of different kinds, was found on the same morning, about 7 o'clock, in the James river, at the Chesapeake & Ohio R. R. wharves, about two miles below Mayo's Bridge—"articles pretty well saturated with water—some had to be wrung out, except one piece of clothing,

that was a little dry, but not dry enough to pack up." On that morning it was high-tide at 5 o'clock, and the tide was running out at 7. In the channel an article might have floated from three to five miles an hour on that tide, but in shore it is hard to say how fast it would float. The body was proved to be that of Fannie Lillian Madison. It was proved that she left Bath county on March 12th for Richmond, pretending that she would join a lady there who wished her to go to Old Point with her and who would pay all her expenses. That on her arrival, about 3 A. M., March 13th, she went to the American Hotel and registered herself as "Miss F. L. Merton, Virginia." That she went out of the Hotel about 11 o'clock that morning, in response to a note or letter which was brought to the Hotel a few moments before and carried to her in her "Room 21," while she was eating breakfast in her room, to which she hurriedly replied by a note in a sealed envelope, which contained only these words: "I will be there as soon as possible, so do wait for me." That she was seen on Belle Isle bridge, and on Belle Isle, with a man about 12:30; returned to the Hotel about 2; went out again about 6:00, with her canvass satchel, returned about 8:30; was left in the parlor *with the prisoner* at about twenty minutes to nine, and was seen no more, by any one who knew her, unless by the prisoner, until her body was found at 7 o'clock the next morning in the reservoir. She was not in her room at 12 o'clock midnight, and did not occupy her room that night. She was a comparative stranger in Richmond; there is nothing in the record to show that she even knew where the Old Reservoir was located, still less, that she knew of the hole in the up and down plank fence near the southeast corner opposite the small-pox dead-house. The only friends she had ever visited in Richmond, lived in the other extreme end of Richmond—on Church Hill—full three miles from the Old Reservoir; the place of her death is a lonely,

out of the way place, fully *two* miles from the American Hotel, where she was alive and well after 8½ o'clock that night. It was a dark, stormy night, snowy and rainy. She went to the Old Reservoir between the hours of 8½ and 12 M. that night. She did not go there alone. A gravel path led from this hole in the fence to a flight of steps at the southeast corner of the embankment; but the fresh tracks of a man and a woman, walking side by side, were traced from this hole in the fence, across a wet clay soil, obliquely up the embankment to the top of the embankment where the ground was furrowed up with tracks all huddled together, one of which fitted the shoe taken from the foot of the dead girl and tried in the track by the coroner. The man who walked with her across the wet clay ground, and up the embankment, and who struggled with her on the furrowed ground on the top of the embankment, as the crossing and intermingling of the tracks shows, either helped a struggling girl, eight months heavy with pregnancy, and only 4 feet 11 inches high, to commit suicide by climbing over a sharp-pointed picket-fence 3 feet 4 inches, and drowning herself in the reservoir,—an irrational supposition; or that man first overcame her strength and stifled her cries, and then threw her into the water. A woman's cry of distress is heard that night about 10 or 10½ o'clock, coming from that direction. She is heard to cry; then, after a moment or two, she is heard again; then, no more. Her body is found in the water next morning just opposite the place of the struggle, and immediately relative to the two tracks of a man close to this picket-fence, pointed toward and looking into the water. Her lower lip on the left side has a bruise upon it, made, "most probably, by *pressure;*" and her actual death by drowning was preceded, perhaps, by partial insensibility, produced by a blow over the right eye and temple. This man, who had been struggling with her, and who had suppressed her cries by his hand pressed upon

her mouth, and rendered her partially insensible by the straight blow over her eye, evidently lifted her over the fence and, resting her feet on the brick embankment, sloping at an incline of forty-five degrees, shoved her head foremost into the water. These are the main facts and circumstances of the situation and surroundings of the body, which show that the girl was murdered.

They are utterly inconsistent with the hypothesis of *suicide.* But this hypothesis of suicide is further disproved by the *distribution* of her garments. The testimony shows that she was drowned sometime during the night, and, probably, before midnight, as the food in her stomach was not wholly digested; yet her canvas satchel was found floating in the James river, two miles below Mayo's Bridge, at 7 o'clock the next morning, with the clothing in it not then, all of it, wet. Had it been thrown in above Mayo's Bridge, it could never have passed the rapids, and in the whirling currents and obstructions, of that part of the stream, it must inevitably have become saturated, and have sunk. It was an open canvas bag, containing clothing that would easily have become soaked with water. If it was thrown in by the deceased, for what possible reason did she wander, that dark and dreary night, from that place where she could, so much more easily and surely have committed suicide, out to the distant and lonely reservoir? But, if it had been thrown in during the night, it would have either become saturated and sunk, or have floated far below the place where it was found. It would have taken this timid, heavily pregnant woman at least an hour to walk from Mayo's Bridge out to the reservoir; and no one met her or saw her, walking more than half the length of the city, wrapped in a red worsted-knit *shawl.* Her red *shawl* was found at six o'clock A. M. on Dunstan's front fence, on Reservoir street, full half a mile from the scene of her death. Her *hat* was found in the dead-house on the Clark Spring property, adjoining the reser-

voir grounds, with *red lint* of wool upon it, and sand or gravel in it.   Why secrete her hat and flaunt her red shawl on Dunstan's fence?   Her *veil* and *one glove* were found just outside the reservoir grounds, at the hole in the southeast corner of the fence, seventy-five yards from the dead-house.   Why were they dropped there?   Why was only *one glove* dropped there? Why was not her veil put with her hat?   Why were they separated?   Why were they dropped at all?   Why was the watch-key that was found inside the fence, and close to the fence, at the hole in the fence, and which the prisoner says belonged to the deceased, jerked off?   The ring upon it was wrenched open, and shows that it was jerked off.   It would not have been jerked off from the watch-chain of a person coming through that hole slowly and deliberately, and from the outside.   It was jerked off from some one going out from the reservoir grounds *in a hurry.*   Upon the theory of suicide, the girl, after she entered through the hole in the fence at the southeast corner, did not cut obliquely across the wet clay ground and up the embankment to the spot where she died, for the female tracks along that way are *side by side* with those of *a man;* but she must have walked along the gravel path to the steps leading up the embankment at the southeast corner. She is on top the embankment, in a few feet of the water. She is without shawl, hat, veil, and one glove, but she still clings to the other glove.   She does not throw herself into the water, but walks along the southern embankment, and, strange to say, stops at the place where the male and female tracks lead up the embankment, obliquely from the hole in the fence to where there are evident signs of a struggle—" a desperate struggle," as one of the witnesses describes it—between a man and a woman; a struggle which begins there, and from which no female tracks return.   Just there, in the midst of that struggle, she drops her other glove; and just opposite to this spot her body is found in the water.

. These facts, even by themselves, and without their correlative or reciprocal relation to and with the train of facts which connects the prisoner with the *deed*, are wholly inconsistent with the theory of suicide; and are inexplicable, except upon the explication of murder.

The mark of a straight blow over and back of her right eye, which did not abrade the skin, could not have been made by her throwing herself or falling, face foremost, headlong and striking upon the bricks of the incline to the water in the reservoir; because it is not probable, if, indeed, it be possible, that such an impingement would not have either staved in her skull, or have glanced and lacerated her *skin*. And, again, because if she plunged and struck her head on the *right side* above the eye, how did she bruise the *left side of her under lip*— "*more probably by pressure?*" But can it be supposed, that a woman in her condition, who had been actively on her feet about the city, on Belle Isle with the prisoner, and in and out of the American Hotel, and who had walked from Main street to the Old Reservoir, nearly a mile, could have climbed over that pointed picket fence without tearing her clothes or breaking the fence, in that dark, inclement, cold night? All the marks upon her body, and the distribution of her clothing, taken together, show that the *defence of suicide* is untenable and impossible. We are not bound, under the rule, to notice a letter of the girl, written in 1883, which was put in evidence by the defence to indicate a suicide. It contains, among other passionate, school-girl expressions, "O, if suicide were not a sin, how soon the lingering spark of my life would vanish; but I will wait God's own time." "Oh, to think of my school, it almost kills me." At this writing, she was about seventeen years old, and in durance vile, as she felt, by her father and mother, who had quarreled with her aunt, Mrs. Tunstall, and had forbidden all intercourse with her aunt, and would not

allow her to go any longer to the school to which she had been sent by her aunt's kindness and expense. But it was written several years before her death; and if it indicates anything, it proves that she would *not* commit the sin of suicide. Another expression of hers, which the defence deems most important, is a remark she made to Captain Wright on the train coming to Richmond on March 12th—when some alarm was felt and manifested about the fast running—that "she wished the cars would run off and kill her." Captain Wright says, "she seemed in good spirits"; "he did not know whether she was joking or not." But, even though she were in earnest when she made the remark, its indication of a tendency to prove suicide is wholly insufficient to account for and overcome the many significant opposing facts in the record which enforce the conviction that she was murdered.

Dr. Taylor, the coroner, says that "the *medical* facts are not inconsistent with the theory of suicide; they do not prove it, either for or against it." If it be possible that, what he calls the mere "*medical facts*" in this case, are *not inconsistent* with the theory of suicide; yet they all are consistent with the theory of murder; which is fully sustained and enforced by the place, surrounding circumstances, and physical facts, which implicate and loudly attest the perpetration of a systematic and deliberate murder.

Who was the murderer? Who had *a motive* to take her life? The girl, an unmarried woman, was pregnant with a child which, it is admitted, was conceived about the middle of July, 1884. Who was its father? What man had an opportunity about the middle of July to cause her pregnancy? She left her father's house, in King William county, on July 8th or 9th, and went to her grandfather's, where, with the exception of a week in August spent with her aunt, Mrs. Hillyard, she staid until October 10th, when she went to Mrs. Dickinson's in Bath

county. The only male visitor whom she saw, while at her grandfather's, was the prisoner, her cousin, with whom she had been intimate for years, and who lived in the adjoining county. They were regarded as "very fond of each other." He had frequently visited her at her father's, and before she came on the 8th or 9th to stay, had, several times, brought her in his buggy to the house of her grandfather, (who was his uncle,) where they would both spend the night. He came there July 10th and spent the night there. The medical testimony fixed her pregnancy as having begun about that time. He slept that night in the same room, but in a separate bed, with her uncle, John Walker. She slept in a room by herself, on the same floor, with an unoccupied room between them, and no lock upon her door, or other fastening. Walker, as was his custom, got up early and went out to attend to his farm duties, and was gone for an hour or more. She was attached to the Prisoner, and he pretended to be fond of her,—and her pregnancy began about that time. The prisoner visited there again, the next month, and spent the afternoon and the night there. The girl occupied her same room, and a niece ten or eleven years old slept with her. That night, after Walker had dozed off, he was aroused by the prisoner leaving the room—saying, when he found that Walker was awake, that his bowels were out of order; but he declined to have Walker to accompany him. Upon his leaving, Walker went to sleep again, not knowing where he went or when he returned. The next morning he said he was well. Again, in September, he spent the night there, on the same floor with the girl, who occupied her room alone. He said to Walker, before going to bed, that he was afraid he would have to go out during the night on account of his bowels, and that it was "strange, whenever he came there his bowels got out of order." These facts—insufficient in themselves, standing alone, to prove that the prisoner was her

seducer, are supplemented by other facts in the record, which, taken all together, induce and justify the conclusion, that *he* first corrupted the mind, and then debased the body of this young woman;—that he was the ruthless destroyer—first of her *virtue*, and then, to hide his crime and to remove an obstacle out of the way of his heartless selfishness—of *her life*. It was proved, that during all her stay in Bath county as a teacher, the prisoner corresponded with her, and that he wrote frequently to her. In her locked trunk, which was sent down to Richmond from Bath, to the police-justice, and opened and examined by him, after her death, there were found many letters from her different friends; but, *among them*, only five empty envelopes addressed to her by the prisoner. Under an old newspaper spread over the bottom of her trunk, were found two papers admitted to be in the handwriting of the prisoner—one, a set of verses in rhyme, narrating, in horrid and disgusting detail, the *seduction of a girl.* ¯It is so abominable and atrocious that, by consent, it does not appear in this printed record. Whether he gave it to her, before or after seduction, is immaterial;—it tends most strongly to prove *seduction*, and points to him as the *seducer.* The other paper was a letter from him to her dated September 14th, 1884. This letter, though much torn and obliterated, shows their *intimacy* One sentence in it has a hidden meaning—it runs: "You remember you have never written that letter you have been promising so long." The postscript reads: "When are you and that fellow going to be married? You know that you told me it would be this winter. I think it would be the best thing for you—*so do*, this winter." Why should he be so importunate that he must underscore his desire for her to be speedily married? What motive prompted his earnest and impatient request to her to hasten her marriage to "that fellow?" That request, that expostulation, that insistence, was addressed to a woman,

unmarried, yet two months gone with pregnancy. It was pressed upon her by the man who had had the opportunity to seduce her; and by the same man in whose handwriting a poem describing a seduction was found in her hidden possession. He began then to fear the consequences of his foul act; hence his villainous and vehement insistence that she and "that fellow" should get married. He wrote to her frequently while she was in Bath—as often as twice in February, as the post-office marks upon two of the envelopes show; yet he failed to produce a single letter from her; a suppression which is significant, considering the fact that the writings found prove criminal intercourse between him and her. She went to Bath county October 10th. The prisoner corresponded with her; on January 5th, '84, she came to Richmond under the pretext that she had received written advisement that "Aunt Jane" (Mrs. Tunstall) was "not expected to live." Upon leaving she told Mrs. Dickinson, her employer, that "Cousin Tommie" (meaning the prisoner) would meet her; and when she returned, on the 8th, she told Mrs. Dickinson that Cousin Tommie *did meet her*, &c. She arrived in Richmond the night of the 5th and registered herself at the Exchange Hotel as "Miss F. L. Merton," and was assigned to "Room 66." The prisoner was in Richmond on 5th and 6th of January. Mr. A. W. Archer, clerk at the Exchange Hotel, identified the prisoner as the man who came to the Hotel January 6th, and, running his finger down the register, fixed it upon the entry, "Miss F. L. Merton, 66," and then asked, "is this lady in?" She was not in at the time, and Mr. Archer so told him. Henrietta Wimbish, a chambermaid, identified him as the man whom she saw in the Exchange Hotel *three* times on the day of the 6th, and who, on two different occasions, asked her if the lady in Room 66 was in; and whom she saw three times that day talking to the lady in "No. 66." Both the witnesses, Archer and Wimbish,

stated that he had a light moustache.  The defence insisted that the prisoner never wore a moustache in his life; and introduced eleven witnesses who swore that they never saw him with one.  The Commonwealth proved by six witnesses, living in his county and King William, that they *had* seen him wearing a moustache; and some of them specified the occasions and the circumstances which made them notice it.  Beside these, three of his college-mates were introduced; one of whom met him in the Capitol Square and talked with him in June, '84; and noticed his moustache.  The other two saw him on the 5th or 6th of January in Richmond, talked with him, and saw him "twirling his moustache with his fingers."  Mr. Cauthorn, who knew him, saw him crossing the street opposite the ladies' entrance to the Exchange on the 6th of January.  She left the Exchange with the prisoner on the night of the 6th of January, and did not return until the next morning; and her room, 66, and the bed were unoccupied that night.  What is the explanation or solution of all these detailed facts and circumstances proved in the record?  There is but one hypothesis that does or can account for them, each and all—that the *prisoner was the father of her unborn child.*  That accounts for her possession of the lewd poem.  That agrees with the fact that he, by taking her in his buggy from her father's house over to her grandfather's house, and both of them spending the night there several times before she went there to stay July 10th, and his spending that night there, had had full opportunity to seduce her; that accounts for his anxiety to have her speedily married; that accounts for his being in Richmond when and while she was here under an assumed name (one that he had used), both in January and March; that accounts for her telling Mrs. Dickinson that the prisoner ("Cousin Tommie") would meet her and had met her; that accounts for his prompt and frequent calling upon her at the Hotel on January 6th; that

accounts for his taking this young girl, his cousin, to a bawdy-house (as will presently appear); and that accounts for the simulated freak of his *bowels*—always after bedtime, and after everybody had retired—whenever he was sleeping at his grand-father's house in July, '84, next to the unfastened and accessible room occupied by Miss Madison. And that hypothesis contradicts no fact in the record. But the record shows, that she again comes to Richmond under a false pretence—"the Curtis letter"—March 12th; that she again registered under his assumed name; that he is again in Richmond with her during the next day, she leaving the American Hotel, where she was registered "Miss F. L. Merton, Virginia," Room 21, hurriedly in response to a note brought there and delivered to her while she was eating her breakfast in Room 21; and that she was with him soon thereafter in a bawdy-house and upon Belle Isle; that upon her return to the American Hotel, between 1 and 2 o'clock P. M. that day, she inquired for the note (the "torn note") which she had written so hurriedly and directed to T. J. Cluverius a few hours before, in response to the one delivered to her, in which she says: "I will be *there* as soon as possible, so do wait for me."

This evidence proves, beyond a reasonable doubt, and to a moral certainty, that he was the destroyer of her virtue and the author of her ruin. Had the prisoner *a motive* to murder the victim of his lust? He was a young lawyer, in good society, and a member of the church, and was engaged to be married to a young lady in his neighborhood. In a month his base conduct would become known, his professional, social, and religious standing were all at stake, and the young lady whom he hoped and expected to marry would be lost to him. His aunt, Mrs. Tunstall, with whom he found a home, it is to be presumed, would doubtless drive, from her presence and her nurture, the heartless author of the shame and ruin of her

beloved young niece, who had been much with her in her home, and whom she had sent to school. Was his motive to murder the girl sufficient? The law recognizes that, what would be a sufficient motive to one person, might not affect or induce another; and lays down the principle that the *motive* ascribed need not be commensurate with *the crime. Wharton on Homicide, section* 670 *a.* Much slighter motives than the prisoner had have led *to cruel murders.* Did the prisoner have the *opportunity* to murder the girl? The prisoner came to Richmond, from his home at Mrs. Tunstall's, in King and Queen county, on the 12th of March, wearing a gray overcoat and a slouch hat, and having with him a pair of *overshoes,* half arctics, or gum. The girl was expected to arrive here on the evening of that day, according to the scheme of the "Curtis letter," which she received and exhibited and read to Mrs. Dickinson on the 10th, as her reason for coming. It was a forgery, written by herself and to herself, which came to her by mail—a thick letter, containing a note in it, in a white envelope. A few days before, the prisoner mailed to her a thick letter in a white envelope, at postoffice, Little Plymouth, King and Queen county, Virginia. The envelope and the *note* in the "Curtis letter" have never been found, hence the State has not been able to prove by the envelope where it was mailed. The presumptions all point to the prisoner as the man who remailed the "Curtis letter" to her; and a remark made by the prisoner to the waiter at the American Hotel, with the evident design (as now appears) of creating, for use, the idea that *he* was *young Harry Curtis,* according to the scheme of the letter, shows that he knew the contents and the scheme of the "Curtis letter." The girl whom he had seduced, and who was fast approaching th elast days of her pregnancy, and whose loss of virtue he had to keep secret from the world, arrives in Richmond on the morning of March 13, about three o'clock, and registers her-

self at the American Hotel under the same false name that both he and she had used, and the same that she had registered by in January, when the prisoner called for her at the Exchange Hotel by running his finger down the register and fixing it upon "Miss F. L. Merton," and asking Mr. Archer, the clerk, if this young lady was in? The girl having been up, travelling the whole night, sleeps late. She is eating her breakfast, in her room, about eleven o'clock, when she receives a note. No one, up to that time, had called upon her. She receives this note, although she was there under an assumed name. Some one must have been expecting her to be in Richmond under this assumed name, and at the American Hotel, otherwise he could not have directed the note so that the clerk at the Hotel could send it to the person for whom it was intended. The prisoner must have written the note, as all the evidence, so far, tends to show; and as that, yet to be reviewed, will indubitably show. She hurriedly wrote a reply: "I will be *there* as soon as possible, so do wait for me," and put it in a cream-colored envelope directed to T. J. Cluverius. She does not say I will be down stairs, or in the parlor, but "*there* as soon as possible." Where? At the rendezvous named, of course, in the note to which she was replying. She hastily got ready and left the Hotel within a few minutes, wearing a dark dress, black straw hat, and red shawl—to meet this appointment. It was then a few minutes after eleven o'clock. The prisoner was standing at, between eleven and fifteen minutes after eleven, that day, one door above the American Hotel, talking to Mr. Henry R. Pollard;—one door from the Hotel out of which the girl was emerging at that time to meet the person who had sent her the note, who knew she was registered at the American Hotel under the false name that the prisoner had himself used, and which he had known and concerted with her to use. About an hour afterwards, she,

or a woman of her size and shape and wearing apparel, hat and red shawl, is met on the Belle Isle footbridge, with a man wearing a light overcoat and a dark, soft, felt hat, whom she addressed in a tone of surprise, in reply to something which he said to her: "Why, Cousin Tommie!" and whom the witness, William Martin, a justice of the peace of Manchester, says, looked very much like the prisoner, and was about his size and general appearance. They cross the bridge and get upon the island, where they are seen by the witness, Charles Isaacs. He identifies both the man and the woman; he identifies, positively and distinctly, the dead woman as the woman he saw on Belle Isle, and the prisoner as the man whom he saw with her. Then they go into the nail-works, on the island. There they are seen and observed by five men— Benjamin Earp, William Kidd, James Thompson, Thomas E. Bethel, and Joseph Perkins—honest, upright, truthful men.

Earp says: "The man (prisoner) looks like the man, but he had a small moustache then. The lady was stout and chunky." Kidd said: "The prisoner resembles the man I saw; is about the same size, but I wouldn't swear he is the same man, because I didn't take notice enough for that. I went down to the jail with, &c. Prisoner was standing in a line with other prisoners. We looked at them so standing, and I picked him out as the man I saw on Belle Isle. I picked him out without assistance. The man had a moustache." Thompson stated that they were in his way when he was carrying heated iron. He touched them to get them aside. He looked at the prisoner. When he came back a few moments afterwards he saw them. "The prisoner is the man I saw. I am confident he is the man. One thing I recognize him by is the sink in his face between the eyes; he had *then* a thin moustache, and the lady was well built, was short and chunky, and had a rosy face, &c. I picked him out at the jail from among the other prisoners. No one assisted me."

Bethel testified: "Think she had a shawl of a red color, which she gathered up around her as she went off. I went down to the jail, with others from Belle Isle, to look at the prisoner, and picked him out without assistance. Won't swear he is the man I saw on the Isle, but he certainly resembles him very much."

Perkins testified: "I noticed her pregnant condition, &c. The lady was a low, heavy set woman, &c. To best of my knowledge the prisoner is the man. I am very confident that he is the man. I went down to the jail to see him, and recognized him without his being pointed out to me."

It cannot be reasonably doubted that the woman with the prisoner was the murdered girl. It would be amazing, indeed, if the prisoner was not with the murdered girl on that occasion, and yet was with a pregnant woman—a "short, chunky" woman—wearing her clothing and a red shawl, and calling him " *Cousin Tommie.*" If the woman with him on Belle Isle was not the girl who was shortly afterwards murdered, why did the prisoner not produce his companion on that occasion, as a witness to prove it? He did not produce her, because in a few hours after he was with her on Belle Isle he had made her silent, in death. She was last seen on the island about twenty minutes after twelve. She was seen with the prisoner at a bawdy house on Fifteenth street, between twelve and two o'clock. She returned to the American between half-past one and two P. M., and was seated by Diggs, the head waiter, in the dining-room, at her dinner. The woman who was with the prisoner at the bawdy house, for fifteen minutes in a room in which the bed was in order when they went in and was rumpled when they came out, was there noticed to have on a red shawl, but wore under it a blue basque, jacket or Jersey. When the dead girl was taken from the reservoir she had on a blue Jersey. Here it was noticed that she had on a blue veil;

the veil of the murdered girl which was found, as before stated, was a blue veil. Thus in every particular of costume the woman who was with him at that bawdy house on Fifteenth street corresponded to the murdered girl. About six o'clock that afternoon the girl left the American Hotel, and returned about half-past eight o'clock; where she went the evidence in the record does not show. The prisoner was seen to enter the American Hotel that evening about eight o'clock and pass towards the register, by Morgan Trent, who knew him by sight. The night clerk at the American Hotel, Mr. W. F. Dillard, establishes the fact that a man (whom he identified, and who, he "feels quite sure," is the prisoner) called that night of the 13th between the hours of eight and half-past eight o'clock at the American Hotel, and asked to see the lady occupying Room 21; that he called the night porter, William Tyler, and told him to show the gentleman to the parlor and to send his card up to the lady in Room 21; and that he started off with Tyler to go to the parlor. Tyler testified: I took the card and showed the young man in the parlor, and went to 21 and rapped on the door. No one answered. One of the servants told me she was out. As I turned back and got to the parlor, I met the young lady and an old gentleman coming up the steps of the ladies' entrance. They walked into the parlor. I went in behind them. The old gentleman sat down by the door, and says, "Here's a lady"; then he asked me could she get a room. I told him yes. This young man, and the old man and lady all got up and passed out. As the young man passed me in the hall, he says, "I don't think that is the lady I want to see. The young lady I wanted to see went to school with my sister." I carried the lady on to her room, and the young man went on down the steps. I told the lady, "When this young man came in he wanted to see you; and now he says he didn't want to see you, but he wanted to see the lady

who went to school with his sister." She said that he was the young man that was to come after her that morning. She asked me where was the young man—was he gone? I told her I would go to the office and ask. I went to the office, and about fifteen minutes afterwards he came in. He seemed to be very restless. I went up to him and says, "This young lady wants to see you; she says you were to come after her this morning." He says, "Where is the young lady? show me the parlor," and I showed him to the parlor, and carried the young lady to the parlor, and there I left her. It was about twenty minutes to *nine* then. "I am certain he is the same man—the prisoner. I recognize his voice. He looks like the very same man. I am absolutely sure he is the same man," &c. Tyler first narrated the remark of the young man to him in the hall, as above stated, that he "wanted to see the young lady who went to school with his sister," on Tuesday night following, March 13th. At that time it was unintelligible. But on the following Thursday the locked trunk of Miss Madison, the murdered girl, was received from Bath county by the police-justice, and in it were found the two drafts of the "Curtis letter." From these it is seen, that the scheme was to simulate, that Miss Madison would be met in Richmond by Harry Curtis, the brother of Miss Laura Curtis, whose name was forged. Miss Curtis had been a school-mate of Miss Madison's. Then it was understood, why the prisoner had thrown out the remark that "he wanted to see the lady who went to school with his sister," and why the young lady said, "he is the young man who was to come for me this morning." Until the trunk reached here on Thursday, 19th March, no living person had seen either of those letters, except Mrs. Dickinson living in Bath county, and the person who mailed to her the thick letter in a white envelope which she received on March 10th. The prisoner made that statement to Tyler and the

young lady's responsive remark, "he is the man who was to come for me this morning," both are relative to the scheme of the Curtis letter, and thus connect the prisoner with a knowledge of the contents and design of that letter. The defence introduced a letter, headed "Richmond, March 14th, 1885," written by the murdered girl to Mrs. Tunstall, in which, after stating her purpose to go on a trip to Old Point, at the invitation of a friend, she says, "love to all, *and tell Tommie*, I will write real soon, but they must not count letters with me," &c., &c. It was purposely misdated, and was written, (evidently at the suggestion of the prisoner,) to support *his defence* of an *alibi.* The girl knew that she had left Bath county the day before to meet an engagement in Richmond on the 12th; and she knew that the next day after her arrival in Richmond in the night of the 12th, was not the 14th. The prisoner had designed to be, and he actually was, at home in King and Queen county the day it was dated, 14th; and the message to "Tommie" was intended to furnish proof that the prisoner did not see her while in Richmond, and was not the man who murdered her. Tyler left her with the prisoner in the parlor at 20 minutes to 9 o'clock on the night of the 13th. She writes this letter hurriedly, goes to her room in such a hurry, that, when she leaves it, she leaves the gas burning brightly un:ler a full head; with the prisoner she comes out of the American Hotel, and he hails a passing street-car going out to the end of the line on Main street, west, to Reservoir street. William Tucker the "Tug-horse" manager, stopped the car for a man and a woman standing on Main street just a little above the front of the American Hotel a few minutes after 9 o'clock. He saw them by the light of the "big lamp," meaning a large size gas-lamp, and he saw them as they got on and into the car at the side of which he was standing. The lady had on a *red shawl*; the man a light greyish overcoat and carried a satchel. He identified

the prisoner as the man; and stated that the car that the couple got on, was driven by Mr. Thomas Williams. Mr. Williams testified that a young man, wearing a light overcoat and slouch hat, and carrying a satchel, and accompanied by a lady, got off his car at the end of the line—at the corner of Reservoir and Main streets. They got out of the car, and the lady stood upon the sidewalk while the man came to him and asked him twice whether the cross street was Reservoir street. He had a chance to see the man, observed that he was wearing a light overcoat and a slouch hat, and that, to the best of his knowl- and and belief, the prisoner was the man. Thus, Treat, who knew the prisoner by sight, saw him come into the Hotel and go towards the register. Dillard, the clerk, sent him up to the parlor with Tyler to see the lady in Room 21; Tyler left them together in the parlor at twenty minutes to nine o'clock. Tucker put them on the street car a few minutes after nine from the street just opposite the American Hotel. Williams, the car-driver, put them off at the end of the line about twenty minutes to ten, at Reservoir street, and saw them start down on the left-hand side of that street, towards the Old Reservoir— the scene of the murder. Dr. Thomas E. Stratton, going down the same street about that hour, overtook a man and a woman going towards the Old Reservoir. The man had on a slouch hat pulled down over his face, so as to prevent its being seen. In size and build he corresponded to the prisoner. He turned so suddenly upon Dr. Stratton, who was walking behind them, as to startle him, and, in a quick, excited manner, asked if that was Reservoir street. This was near to the intersection of Cary and Reservoir streets, and when they got to the inter- section Dr. Stratton went on Cary street, and the man and the woman kept on Reservoir street towards the Old Reservoir. Thus, this couple, which every fact shows, were the prisoner and the murdered girl, were going a little before ten o'clock

towards the reservoir, where her dead body was found the next morning. They are on the embankment together; their tracks lead up to the top just opposite to where the body was found, and where were evident marks or indications of a scuffle between a woman and a man. The record shows that the prisoner brought with him a pair of old overshoes, gum or half arctics, the impressions of which would make the tracks of the man described by the witnesses. While this fact of the overshoes does not prove that the tracks were his tracks, yet it disproves the assertion that they could not have been his. Between ten and eleven o'clock that night the cries of a woman in distress are heard coming from the direction of the reservoir. On the lower lip of the murdered girl is found the indication of some "pressure;" she struggles to remove the hand from her mouth, and deeply imprints it with five semi-circular marks of her finger-nails. She cries aloud again. More severe means must be used—the man strikes her a straight blow over the right temple, which renders her insensible. The autopsy shows that she was insensible before she struck the water. The deed is done, and all traces of it must be obliterated. There is no certainty that her cries had not been heard. If he leaves the garments on the bank they will lead to a quick discovery of her body, and his *alibi* will be hurt, and the letter dated March 14, with a message in it to "*Tommie*," will be of no use. It must be quick thought and action now; in the darkness of the night he fails to pick up one of her gloves. With the rest of her garments he hastens along the embankment and down the southeastern steps and along the gravel walk to the hole in the fence. Had he not gone this way his return tracks would have been seen. The hat and the red shawl were evidently huddled up together, for the hat had red lint on it like the wool of the red knit shawl. Hurrying through the hole in the fence, his watch-key is jerked off and falls inside the

fence a few feet from the hole, where it was found on Sunday the 15th by three little boys. The ring by which it had been suspended to the chain showed by the wrench that it had been violently and suddenly jerked off. The evidence shows that it was the prisoner's watch-key. In his haste or entanglement in getting through the hole, he drops her glove and veil. As he hurries past the dead-house he throws her hat in through one of the broken windows. He hastens towards the city, and on Reservoir street near Cary, where the lamps may reveal the red shawl, he throws it over a fence, where it was found the next morning. He hurries on down into the city, wanders about and hides the satchel until the next morning, and goes to his Hotel—the Davis House—about 12 o'clock. He paid his bill and asked to be called at 5 o'clock, and went up to his room. He sent the boy down for a bottle of whiskey which was sent up. When told by Mr. Davis that it was a beastly hour for him to get up, he said he had to leave on the York River road in order to take the boat from West Point up the Mattaponi. The satchel was thrown into the river that morning, and the tide was running out about 5 o'clock. The watch-key was found March 15th inside the fence near the hole in the fence, by a boy named Johnny Williams and two other boys. It was carried to the detective John Wren, who, in the presence of Mr. John Owens, had it immediately examined by a jeweller, and it was preserved just as it was found. The evidence shows that, beyond all reasonable doubt, the watch-key belonged to the prisoner. He said that he had not seen the watch-key since September; certainly the girl had had no opportunity to get it from him since February, when it was seen on his chain by John Walker, unless she was with him during March 13th. It was an odd-shaped, gold key, and had a crown or semi-ring at the top, and a small ring or loop in the middle by which it was suspended on the chain. Judge Foster, the judge of King

William county, noticed the prisoner, when practicing in his court, with "a small, gold watch-key with a ring in the centre and a raised crown head," on his watch-guard. He saw him twirling it with his hand. When shown the key found at the reservoir, he said: "This has a general resemblance to the key; can't testify that it is the identical key." M. Gatewood, postmaster at Aylett P. O., saw the prisoner there in July, acting as counsel for one of the parties in a warrant trial. While the prisoner was speaking he nervously handled a gold key upon his watch-guard; and when the key found was shown to him, he says the key resembles the one he saw the prisoner handling. John Walker says that, during a visit he made to Mrs. Tunstall in the latter part of January or first of February, while sitting talking with the prisoner, he noticed that he had on a gold chain instead of a black guard. He remarked upon it to the prisoner, asked where he bought it, and they talked about their watches. They were sitting side by side. They were both nephews of Mrs. Tunstall, and were neighbors and friends. Walker was looking at the chain. Prisoner said he had bought it in Richmond, at the administration sale of Mitchell & Tyler, for $13.50. Walker said: "It can't be gold." It had a key attached by a small chain (watch-key found was shown to the witness). This looks very much like the key. I have seen him wearing something like it attached to a black guard.

Herman Joel, a jeweller residing in Richmond, and who had been in this country about four years, and whom the record shows to be a truthful, fair-minded man, testified that, while he had a shop in Centreville, in King and Queen county, he repaired or fixed a watch-key for the prisoner; and when shown the key in evidence, he says it looks very much like the same key, and he believed it to be the same key; but that he would be able and willing to say positively if he were permit-

ted to take it apart, that he would know his own work. The Commonwealth asked, respeatedly, and at different stages, that the witness should be allowed to take the key apart before the jury and the court; but the prisoner objected strenuously, and it was not permitted to be done. The witness mentioned several occasions when and where he had seen the prisoner in Centreville, and produced an order which had been brought to him by the prisoner: "Mr. Herman Joel will deliver to T. J. Cluverius, *the bearer of this order*, my watch. January 1st, 1885. Little Plymouth, King and Queen county, Virginia. Calvert Harris." Across the face of this order is the endorsement: Delivered Jan. 5th, 1885.

The witness says that he had had this watch a long time, and that when this order was handed to him by the prisoner, he told him that it had been hanging there so long that it needed oil, and he would like to give it a little fresh oil; whereupon the prisoner said to him, "funny, like a lawyer, if I wasn't going to deliver the watch, he was going to make me do it." The testimony of Mrs. Dickinson and of Willie Dickinson proves that the deceased did not wear or use a watch, or a watch-key, while she was in Bath. This watch-key, of a peculiar shape and character, which is very like the one which Judge Foster, Mr. Gatewood, and John Walker saw him wearing, and which Joel, the jeweller, believes is the same key he fixed for the prisoner, *fits the prisoner's watch;* and when the prisoner was arrested he had attached to his watch-chain a charm-chain, about an inch long, without any key or charm to it. It was first seen on his chain, by Captain Epps and Mr. Robbins, who made the arrest, at Mrs. Tunstall's, in King and Queen county. Captain Epps had noticed it in the supper-room, and when they had gone into the prisoner's room, up stairs, and while the prisoner was leaning over in the act of changing his clothing before leaving for Richmond,

Captain Epps shook his own watch-chain to call the attention of Mr. Robbins to the prisoner's charm-chain, and Mr. Robbins noticed and made sign to Captain Epps that he noticed it. That night, on their way up to Richmond, they stopped all night at King and Queen Courthouse. There it was still seen on the prisoner's chain by Captain Epps and by Mr. Oliver, the deputy sheriff of King and Queen county, who had assisted in the arrest. Captain Epps, saying to himself, "little does he know, yet, that I have noticed that piece of chain." When they reached Richmond the next afternoon the prisoner had managed to work it off. When asked by the officer, Captain Epps, who was searching the prisoner, "where is that piece of chain, sir?" he said "there was none on there." Captain Epps replied: "Ah! ah! don't you tell me that; yes there was." The prisoner then said: "I gave it to my brother." Captain Epps: "When?" Prisoner: "Last night." He was put in a cell and locked up. Captain Epps went to his cell door and called him, and said, "Cluverius, I am sure I saw that piece of watch-chain on your watch-chain at King and Queen Courthouse." Prisoner said: "No, you didn't, Captain. Why, do you want it?" Epps said "Yes." Prisoner: "I gave it to my brother." Epps: "When?" Prisoner: "Last night; I can get it for you." Captain Epps subsequently obtained it from the prisoner's brother, but it was after an interview of the prisoner with his brother, and in Captain Epps' absence. Why did the prisoner thus work off this part of a chain to which a watch-key would hang, between his arrest and his arrival in Richmond? Why did he make, almost in the same breath, two explicit, positive false statements about it? He knew that he had lost his watch-key; he did not know but that it might have been, or would be, found, hence he got rid of the pendent piece of chain from which the reservoir watch-key had been jerked off as he hurried through the hole in the

fence with the hastily gathered-up bundle of the murdered girl's garments.

The conduct of the prisoner, the testimony of Judge Foster, of Gatewood, of Walker, and of Joel, remove all doubt that the key belonged to the prisoner; and the key itself proves his presence with the murdered girl that night at the scene of her death, without the aid of the testimony of Dillard, Tyler, Tucker, Williams and Stratton. All the probabilities, all the inferences, and all the *facts* point to the prisoner as the man who, with "studied, sly, ensnaring art," first betrayed the trust of this young girl, to the loss of her *virtue*, and then to her death. The evidence in this record shows that "all the circumstances of *time, place, motive, means,* and *opportunity*" point to the prisoner as the perpetrator of this ruthless and dastardly crime. It only remains to show that the circumstances of his *conduct* prove his guilt. When these all concur, says this court, in *Dean's Case, supra,* "it must produce a moral, if not an absolute, certainty of his guilt." He came into the Davis Hotel on the fatal night of the 13th of March, about twelve o'clock. Where he was during the day and the early part of that night he made no attempt to prove, although, when arrested, he told the officers "it will be easy enough for me to prove where I was. Every place I went to I met somebody that knew me." From the first moment of his arrest he displayed remarkable coolness and calmness—a self possession too extreme to be consistent with innocence. When told by the officers that he was arrested for murder, he does not ask for the murder of whom? He shows no indignation, but coolly invites the officers in the house to supper, and inquires what evidence there was against him? And, when the officer refused to tell him, he said, "I should like to know, sir, so that I may know *what line of defence* to prepare." Such coolness—such indifference even to the *name* of the person murdered or

the *place* of the murder, could be exhibited only by a person who was anticipating his arrest and had braced and schooled himself for the event. After the warrant for his arrest was read to him by the officer, he said, " I was there, but I did not see her when I was in Richmond." The testimony of the numerous witnesses who saw him with the deceased on that day and early night, at different parts of the city, has already been detailed. After the party were riding away from Mrs. Tunstall's, the prisoner, seated by the side of the officer Robbins, replied to the direct question from Capt. Epps, " Did you see Miss Madison when you were in Richmond?" " I no more saw Miss Madison than Mr. Oliver did." Mr. Oliver was the deputy sheriff of King and Queen county who had helped to make the arrest. When he was just leaving the house to accompany the officers to Richmond, he discarded his own *slouch* hat, and took a stiff Derby hat, and pulled it down on his head, and said, " I'll wear this, mine has a hole in it." Dr. Beale and Dr. Cabell prove the character of the *five* marks upon his hand. " They were then circular—not like they were made by briers or splinters—I think they were of such a nature as might have been made by finger-nails." "They were nearly circular—might have been made by finger-nails; don't think striking against furniture or fence *could have made them.*" The marks were noticed on his hand, at Centreville, on March 14th before he and his father started home. Two witnesses, Estis and Pierce, testified that they heard him tell his father, that he got them on his hand by striking his hand against the car railing. When he reached Richmond, under arrest, he told Policeman Sweeney, that it was "a kind of eruption." Mr. R. D. Wortham testified to the efforts of the prisoner in the police court to hide from view the back of the hand upon which were the scratches. Upon his trial his father attempted to account for them by stating that he saw him slip and scratch

his hand against a knot-hole in a fence, at Centreville, when they were starting home. Do not all these contradictory statements, the attempt to hide the charm-chain, and the attempt to hide the scratches on the back of his hand, and the repeated false statements as to both, and his indifference when told that it was his pregnant cousin whom he was charged with murdering—all show the conduct of a guilty man? Now, all the circumstances of *time, place, motive, means, opportunity* and *conduct*, concur in pointing to the prisoner as the perpetrator of the crime, and "must produce a moral, if not absolute, certainty of his guilt."

The jury were fully justified in finding their verdict; and the trial court did not err in refusing to set that verdict aside.

The eighth bill of exceptions presents the question, whether the court erred in overruling the motion in arrest of judgment? It is insisted—1st. That there is no verdict set forth in the record. 2d. That the verdict is defective. 3d. That the record does not show that the prisoner was present when the verdict was received. All three of these mere technical objections are raised upon the form of the court's order in the following words: " At a like hustings court, continued by adjournment, and held for the said city, at the courthouse, on the 4th day of June, 1885, the said Thomas J. Cluverius was again led to the bar, in the custody of the sergeant of this city, and the jury sworn for the trial of this cause were brought into court in the custody of the said sergeant, and, having fully heard the arguments of counsel, upon their oaths do say, that the said Thomas J. Cluverius is guilty of murder in the first degree, as charged in the indictment. And thereupon the said Thomas J. Cluverius was remanded to jail."

The record follows the usual form, and shows clearly that there was a verdict; and that a motion was made on June 5th, to set aside this very verdict, rendered the day before.

The indictment is in the common law form for murder. In *Livingston's Case*, 14 Gratt. 592, this court held, that an indictment in the common law form for murder, is good, and will support a conviction for murder in the first degree. The common law form of indictment charges both degrees of murder, and it depends upon the proof whether the verdict shall be for murder in the first or second degree. See *Mitchell* v. *State*, 5 Yerger, 340; 8 Yerger, 514. On page 525, Judge Green says: "This indictment for murder is in the common law form. An indictment, therefore, which charges the party with murder, will embrace both cases, and authorize a conviction for either." On page 531, Catson, Chief-Justice, says: "The defendant here is indicted for the crime of murder generally. The offence charged in the bill of indictment is murder, according to the common law and according to the second section of the penal code. Murder in both its degrees is charged upon him in the bill of indictment." See also, *Hines* v. *State*, 8 Humph. 597. In *Kennedy* v. *The People*, 39 N. Y. page 245, it was held: "An indictment for murder in the common law form, charging the killing with malice aforethought, is good, notwithstanding our statute has divided the crime of murder into different degrees; and a verdict finding the accused "guilty as charged in the indictment," is a conviction of murder in the first degree. (See also, *Fitzgerald* v. *The People*, 37 N. Y. 413–426.) The jury was required by law, to state in their verdict of what degree of murder they find the prisoner guilty; hence the words—" in the first degree."

Does the record show whether the prisoner was present when the verdict was rendered? The record alleges that the prisoner was brought into court. No intimation is made that the prisoner left the court-room. The same order was entered as to his presence on each day of the trial from May 5th to June 4th inclusive. In *Lawrence's Case* 30 Gratt. 851, this court, in

answering an objection like the one here raised, said: "But what seems to be conclusive on the subject is, that at the conclusion of the proceedings of the court on that day, it is stated in the record that 'the said Charles Lawrence is thereupon remanded to jail'—which shows that he had been personally present during all the proceedings which were had in the case on that day." The order in this case is fully sufficient, and the court did not err in overruling the motion in arrest of judgment.

The ninth bill of exceptions insists that the court erred in refusing a new trial upon the ground of after-discovered testimony. An affidavit of Dr. Joseph R. Garlick, which set forth that he had an intimate acquaintance with the handwriting of Fannie L. Madison; that he had "no question of the fact that the note is in her handwriting; that his conviction is positive that the handwriting on the envelope is not that of F. L. Madison, and that this conviction is founded upon his intimate knowledge of the handwriting of F. L. Madison," &c.

The prisoner knew, well and familiarly, that Dr. Garlick had been, a few years before, the teacher of the murdered girl; and he could, by reasonable diligence, have obtained his testimony. Dr. Garlick was acquainted with her general handwriting, from exercises and letters submitted to him as her teacher when a school-girl, some years before, and which were most probably executed with deliberation and care. He was now looking at a direction on an envelope written in great haste and evident sudden flurry. It is much more difficult to swear that a writing is *not* in a person's handwriting, than to swear that it is. Dr. Garlick was not proved or alleged to be an expert. The prisoner had had ample opportunity to prove, by his experts, that the handwriting of the direction on the envelope was not that of Miss Madison. He was allowed to submit it to his experts, and after they had examined the

papers, he failed to put them on the stand. Now, after the trial is over, he offers a witness, who is not an expert, to swear that *his* conviction is positive that the writing on the envelope is not genuine. This court cannot allow so dangerous a precedent. Even if Dr. Garlick had sworn on the trial, positively, that the direction on the envelope was not in the handwriting of Miss Madison, it would have had no effect upon the verdict. The jury would simply have thought him mistaken. If the note was in her handwriting, as to which Dr. Garlick swears there can be no question, why was not also the direction on the sealed envelope? There is nothing in the record to suggest or permit the idea that anyone changed the envelope; for, besides its being fully and distinctly identified by the persons who saw and handled it, when it was found, no one had known of the prisoner's being in the city, much less in communication with the young lady. But, when that note was torn by Dodson, the clerk, and the fragments of the envelope and of the note inside, were thrown into the waste-basket, on Saturday evening, after he found that the lady in "Room 21" had left the Hotel without paying her bill, *its identity was fixed to the exclusion of the possibility of substitution or alteration.* The Hustings court did not err in overruling the motion for a new trial founded on this affidavit.

We have reviewed this most voluminous record of the proceedings of the Hustings court in this protracted and difficult trial, and we find no error, of law or fact, which would justify this appellate court in interfering with the verdict of the jury or the judgment of the court.

The prisoner has had a fair and impartial trial. He has been defended, both in the Hustings court and in this Court of review, by able, experienced, and most faithful counsel; and the *law* has been vindicated in the result.

Justice to the prisoner, and mercy to all the innocent *public,*

whom the impunity and second offence of the prisoner would "after gall," alike demand that he shall now pay the penalty of his crime; and, answering with his life for his foul deed, live not to act another! The judgment of the Hustings court is affirmed.

LEWIS, P., concurred in the opinion.

RICHARDSON, J., concurred in the results.

LACY, J., concurring in the results, said:

The plaintiff in error was indicted in the hustings court of the city of Richmond upon the charge of murder, on the 6th day of April, 1885; tried in the said court upon the said charge, and convicted on the 4th day of June following of murder in the first degree, and on the 19th day of June, 1885, sentenced to be hanged. Upon a writ of error to this court, there are eight assignments of error.

The first assignment is as to the rejection of two *veniremen*, upon the challenge of the Commonwealth, for cause. First, as to the rejection of the *venireman*, R. W. Larke. Larke had been examined upon his *voir dire*, and accepted as a competent juror, and his name placed upon the panel. He was then challenged upon the ground that he had said that he would not convict any man upon circumstantial evidence under any circumstances. It was proved by the Commonwealth that Larke had said, a few days before the trial, that he had not formed any opinion about this case, and said that he would not hang any man on circumstantial evidence. Larke, however, stated, under oath, that he had forgotten this conversation, and could not recall the words he used on that occasion, but that he meant by what he said that a man ought to be very slow and cautious

in convicting a man on circumstantial evidence; that if the case presented an unbroken chain of circumstantial evidence, fully proved, he would convict him, if convinced; that he did not remember saying that he would, under no circumstances, hang a man on circumstantial evidence, but he would be very cautious in doing so; that he made the remarks attributed to him in a general way. And being over sixty years of age he was not liable to jury service, a fact which he had not before thought of, and he claimed his right to be, on that account, discharged from further service in the case. Whereupon he was told to stand aside.

There can be no question, under the decisions of this court, that if a juror is improperly stricken from the panel by the trial court, it is error for which this court will reverse the judgment. It is equally clear upon reason that a competent juror cannot be arbitrarily rejected by the court; to hold otherwise would undermine the whole system of jury trial. And it is not necessary that the plaintiff in error shall show actual injury in a case which shows that the juror has been improperly rejected, because when any legal right has been denied to a party on trial for a criminal offence, or any of the safe-guards thrown around him by law for his protection has been disregarded, it is not for this court to say what might or might not have been the effect upon the accused. The law will intend prejudice, if it be necessary to enable him to exercise his right to have the judgment of the court reviewed in the appellate tribunal, and will hold it impossible in such a case to say that a fair and impartial trial has been had. No challenge is allowed the Commonwealth except for cause (sec. 6, ch. 17, Crim. Code, Acts 1878–79, p 340); and when such challenge is made, the same must be shown, and the cause must be a good and legal cause for the exclusion of such juror; if not such, the court must, in its discretion, overrule the same, and the exercise of

this discretion is matter of review for this court. Sec. 7, chap. 17, Crim. Code, Acts 1877–78, p. 341. *Montague's Case,* 10 Gratt. 767. That Larke would be slow and cautious in convicting a man upon circumstantial evidence, or that he would not convict until he was *convinced,* I think, with all deference, was no ground for his exclusion, but the contrary. He was declaring views which should have been impressed upon every member of the jury. *Johnson's Case,* 29 Gratt. 817; *Jackson's Case,* 23 Gratt. 930; *Algheri* v. *The State,* 25 Miss. 584; 1 Stark. on Ev. 572; *Grayson's Case,* 6 Gratt. 712; Same case, 9 Gratt. 613; *Smith's Case,* 21 Gratt. 809; *Pryor's Case,* 27 Gratt. 1009.

But as to Larke, his exclusion cannot be rested on his opinions concerning circumstantial evidence, however correct. Under the first section of chapter 158 of the Virginia Code he was not liable to serve on the jury, and had a right to be discharged upon his motion, if made in time; and as he had not been sworn upon the jury, his claim to be discharged for that case did not come too late, and the hustings court did not err in discharging him from further service. Sections 16, 18, 19, 20, ch. 158, Code of 1873. As to the *venireman* Goode, he had laid a wager upon the result; had bet, a trifle, certainly, but still he had made a bet that the accused would be acquitted. This gave him an interest in the result, which *might* influence him, how much, could not be determined. A juror should be wholly free from interest. This he could not be, and he was properly rejected by the court. "For a juror to sit in the trial of a cause upon the result of which he has a wager, is a gross impropriety and offensive to the sense of justice," in any case whatever. See *Essex* v. *McPherson,* 64 Illinois, 549.

The third assignment is as to the mode of impaneling the jury. The court proceeded to examine the *veniremen,* summoned under several successive *venire facias,* until sixteen persons had been directed to take their places upon the panel. The

other *veniremen* were then discharged, and the list of sixteen submitted to the accused, in order that he might strike off four names—the remaining twelve to constitute the jury for the trial of the case. It was insisted by the accused that the court should proceed with the examination of the *veniremen* upon their *voir dire* until twenty-four persons, free from exception, had been obtained; that sixteen should be selected in some manner from the twenty-four, and then the list of sixteen, thus obtained, submitted to the accused. But the court overruled this motion of the accused, and this action of the court is assigned as error. Section 4, of chapter 17, Crim. Code, Acts 1877–78, p. 340, provides: "In a case where the punishment may be death, the writ of *venire facias* shall require the officer to summon twenty-four persons in the manner provided in section three of this chapter." (Section three requires sixteen to be summoned, in a case of felony, other than where the punishment may be death.) Section eight of the same chapter provides: "In all cases where the punishment may be death, *there shall be selected from the persons summoned a panel of sixteen persons, free from exception,* and from this panel the accused may strike four, and the remaining twelve shall constitute the jury." The accused is allowed by this law a peremptory challenge as to four only; and the construction of this section has led to much difference of opinion in the profession and among the circuit judges, and the decisions of the latter thereupon have led to several appeals here, which will be hereafter mentioned, these courts having decided the question in different ways. In *Hall's Case,* 80 Va. 555, the circuit court held that, by the true construction of this law, when the twenty-four persons had been summoned, and twenty-four found free from exception, sixteen must be selected by lot, and that the accused might strike off four, and the remaining twelve should constitute the jury to try the case.

In the cases of *Richards, Fry & Fauver* v. *The Commonwealth,* *ante* p. 110, the ruling of the circuit court was the same. In *Honesty's Case, ante* p. 283, and *Banks' Case*, not reported, the court below held, that from the twenty-four persons summoned (those cases being cases where the punishment might be death) a panel of sixteen persons, free from exception, should be selected, from which the accused struck four, and the remaining twelve were sworn as the jury to try the case. In *Hall's Case*, and the *Richards, Fry & Fauver Case*, this court reversed the circuit court for error in the ruling on this question, stated above. In *Hall's Case* there was no exception at the trial on this point; in !*Richards, Fry & Fauver's Case*, exception was taken. In *Honesty's Case* and *Banks' Case* this court affirmed the judgment of the lower court, it being in accordance with the decision of this court in *Hall's Case* and *Richards, Fry & Fauver's Case*. The decision of the hustings court of Richmond in this case was in accordance with the foregoing decisions of this court, above cited, and there is no error therein on this point.

The statute of 1866–'7, acts of that year, pages 932, 933, did provide that a panel of twenty-four persons, *free from exception*, should be completed, and that the accused should have the right to strike from this panel eight persons, leaving sixteen, from which a jury of twelve was chosen by lot. By the act of 1870–'71, section 9, chapter 262, page 358, this law was amended so as to require a panel of sixteen to be completed from the twenty-four summoned by the writ of *venire facias*, provided for by the 4th section of chapter 262, page 357, and the accused was allowed by the said 9th section a peremptory challenge as to four only, instead of eight, as in the act of 1867; and, as we have seen above, this is the mode prescribed by the act of March 14th, 1878. Acts of 1877–'78, page 341, section 8, chapter 17. There is no confusion nor uncertainty in the law on this subject. Twenty-four are directed to be

summoned in a prescribed mode, from which sixteen must be found free from exception upon their examination, upon their *voir dire*, and the jury is obtained from the sixteen, and if the eight others are not discharged in the course of obtaining the sixteen, as the law provides, then they are discharged as not required for service in the case; and the twelve to constitute the jury having been obtained, either by the peremptory challenge of four by the accused, who are in that case discharged, or the twelve jurors are obtained by lot if the accused declines to strike off the four, or any part of the four, as his privilege is, and the case proceeds. The hustings court of Richmond, having pursued the course prescribed by the law as to this question, I see no error therein.

The next assignment of error is as to the action of the court in allowing the attorney for the Commonwealth to ask the witness, Archer, "Do you remember whether at the jail you had any conversation with him (the accused) or not when he had last seen Miss Madison (the deceased)?" The question was objected to as leading, but the objection was overruled by the court; and also the question, "Do you remember whether in the jail you asked him (the accused) if he had ever seen you before?" The witness had stated that he could not recall the conversation, and the object of the question was to aid his recollection.

Upon the examination of witnesses in-chief, leading questions are excluded by a well-established rule : that is, questions which suggest to the witness the answer he is to make; but where the matter to which the witness is examined is merely introductory of that which is material, it is frequently desirable to lead the mind of the witness directly to the subject; and when the witness is examined as to material facts, it is in general necessary, to some extent, to lead his mind to the subject of inquiry.

The rule as to the exclusion of leading questions must be understood in a reasonable sense, for if it were not allowed to approach the points at issue by such questions the examination would be most inconveniently protracted. To abridge the proceedings and to bring the witness as soon as possible to the material points on which he is to speak, the counsel may lead him on to that length. The rule, therefore, is not applied to that part of the examination which is merely introductory of that which is material. A leading question has been defined to be one which instructs the witness how to answer, or which puts words in his mouth to be echoed back, or in some way suggests the answer desired, and that a question calling for a direct negative or affirmative is not leading unless it suggest one more than the other. And also, that where an inquiry of a witness, whether a certain person by name showed him where a corner of land was, may be in a sense leading, it was not within the rule of exclusion, since it was, in itself, merely inducement and of no importance; that it was best such questions should be put in a leading form to save time. But the main inquiry, what did he show you as the corner? should be left entirely to the witness.

In some cases leading questions are permitted in a direct examination, as where an omission in his testimony is evidently caused by want of recollection which a suggestion may assist. 1st Starkie on Evidence, 129 ; *Snyder* v. *Snyder*, 6 Binn. 483 ; *Page* v. *Parker*, 40 N. H. 47 ; *Spear* v. *Richardson*, 37 N. H. 23 ; *Wilson* v. *McCulloch*, 23 Penn. St. 440 ; *Kemmerer* v. *Edelman*, 23 Penn. St. 440 ; *Aceno* v. *Petroni*, 1 Stark. R. 100. Upon this subject, it must be borne in mind, that much weight is due to the decision of the trial-court upon the admission of questions which appeared to the presiding judge as necessary under all the circumstances then existing to arrive at the truth. This matter rests so largely upon the discretion

of the trial-court, indeed, that the question when and under what circumstances a leading question may be put, has been held to rest so entirely upon the sound discretion of the court as not to be a matter which can be assigned for error.

In the case of *Moody* v. *Rowell*, 17 Pick. 448, it was said: "The court has no doubt that it is within the discretion of a judge at the trial under particular circumstances to permit a leading question to be put to one's own witness: as when he has exhausted his memory without stating the particular required, when it is a proper name, or other fact which cannot be significantly pointed to by a general interrogatory." See also *Donnell* v. *Jones*, 13 Ala. 490; *Walker* v. *Dunspaugh*, 20 N. Y. 170.

The main question with this witness here was to prove the substance of a conversation had with the accused at the jail. The witness, after several questions from the counsel, and then from the court, after a pause, had said: "I cannot recall the conversation." He was then asked: "Do you remember whether in the jail you asked him if he had ever seen you before?" While this question was leading in form, it was not as to a material fact or circumstance. It was immaterial whether the witness had asked this question or not; its object and its effect was only to lead the witness to a consideration of the conversation, and however answered, proved no material fact or circumstance, and was not excluded by the rule as to such questions. The other question: "Do you remember whether at the jail you had any conversation with him or not about when he had last seen Miss Madison?" was admissible for precisely the same reason; it was as to matter of inducement merely, when the recollection of the witness was at fault; it was not as to matter material to the case.

In cases of conversations, admissions and agreements you may draw the witness' attention to the subject, occasion, time,

place and person, and ask directly whether such person said anything on the subject thus brought under his attention, and, if answered yes, then what did he say? 2 Phil. on Evid. 747; 4 Wend. 428; 1 Stark. on Evid. 124, note *w*, 6 Am. Ed. The cited cases of *The State* v. *Johnson*, 29 La. 717, and of *Turney* v. *The State*, 8 Smedes & Marshall, 106, are not authorities to the contrary. The questions in those cases are leading as to the material fact sought to be established, and are excluded under the rule.

The next question to be considered is as to the forged letter purporting to have been written by Miss Laura M. Curtis (who had no connection with it), to the deceased shortly before her death, and which was written by the deceased to herself. The admission of this letter is objected to as coming within the description of *res inter alios acta.*

Whatever may have been the justice of the objection to the admission of a letter as evidence written by Miss Laura Curtis to the deceased, without the knowledge or concurrence of the plaintiff in error, as the letter of a stranger with whom he had no connection, and for whose act he was in no wise responsible, such objection has obviously no force when applied to the admission of this letter. It was not the act nor the letter of a stranger; it was not the letter of Miss Laura Curtis at all; she did not write it at all; she had no knowledge of nor concern with it. It was a letter written by the deceased, and used by her as showing her reason and motive for *leaving her home and going to an alleged assignation house with the plaintiff in error, where she met her death.* And evidence is offered by the Commonwealth tending to show that the letter was submitted for approval to the plaintiff in error, and by him sent through the mail to the deceased and forthwith exhibited by her as the cause of her leaving home. It is proved to have come through the mail to the deceased,

and her immediate action thereon is proved. It came from somebody; that person is proved not to have been the pretended author. Miss Laura Curtis did not send it. It was written by the deceased to herself. Whatever weight it might have, is not the question. The question is whether a letter produced by the deceased, and used by her as showing the motive of her leaving her home, written by her and sent to her by another, was admissible as one of the surrounding facts of the transaction which ended in her death, or, as these surrounding facts of the transaction are usually termed, the *res gestæ*, to be submitted to the jury, to be by them weighed. If this fact could be established by competent means, and affords any fair presumption or inference as to the question in dispute, it was admissible as part of the *res gestæ*, for so frequent is the failure of evidence, from accident or design, and so great is the temptation to the concealment of truth and misrepresentation of facts, that no competent means of ascertaining the truth ought to be neglected.

The principle upon which this indirect evidence is used by courts is aptly illustrated from the course of the ordinary concerns of life, thus : " Where an ordinary inquirer could not obtain information from any witness of the fact which he was anxious to ascertain, either immediately from such witness, or mediately through others, or when the information which he had obtained was not satisfactory, his attention would be directed to the circumstances which have a connection with the transaction, as ascertained either by his own observation or by means of the observation of others, to enable him to draw his own conclusions; and in pursuing such an inquiry, when it was of importance and interest, he would neglect no circumstances which were in any way connected with the transaction which could either singly or collectively enable him to draw any reasonable inference on the subject. All his experience

of human conduct, of the motives by which such conduct was likely to be influenced under particular circumstances, of the ordinary usages, habits, and course of dealing among particular classes of society, or in particular transactions, would be considered." The foundation of indirect proof is the establishment of one or more other facts, from which the inference is and ought to be made. The law requires that these facts shall be established by direct evidence, in the same manner as if they were the very facts in issue. Great latitude is justly allowed by the law to the reception of indirect or circumstantial evidence, the aid of which is constantly required, not merely for the purpose of remedying the want of direct evidence, but of supplying an invaluable protection against imposition. The law, however, interferes to exclude all evidence which falls within the description of "*res inter alios acta,*" the effect of which is to prevent a litigant party from being concluded or even affected by the evidence, acts, conduct, or declarations of strangers. It appears to be clearly within the rule as to the admission of the surrounding circumstances of a transaction to admit, as part of the *res gestæ*, this letter, the reason given by the deceased herself for her first fatal steps toward her approaching destruction. And it was clearly not the act of a stranger, but the act of the deceased, *closely connected with her death.*

The next assignment of error is as to the admission of the note in the handwriting of the deceased, enclosed in an envelope addressed to the plaintiff in error. It cannot be necessary to discuss this question at any length. It is admissible for the same reasons that have been given for the admission of the forged letter; and these reasons are more cogent and less liable to objection as we draw nearer to the chief fact under investigation. This was a note written by the deceased a few hours before her decease to some person in communication

with her.    Upon what principle can it be excluded, if we are really in search of the truth?    Why should the court shut its eyes, in this search for the unknown fact, to this very important circumstance, standing close to the end of the whole investigation?    This woman was at a hotel under an assumed name; she was a stranger to all around her; a note was brought in addressed to her by *her assumed name*; she was known by *that name* by some person who was in communication with her; the contents of the note sent to her are unknown, but there was an answer, fully identified as such; she is alleged to have been taken out to a lonely spot a few hours after and murdered; the murderer is unknown; no person has yet been identified as in her company during those hours so pregnant with her fate. Is not this note *an all important fact grouped with others very close to the subject of investigation?*    It can be excluded upon no principle which would not exclude the evidence of her bonnet in the dead-house, her glove on the parapet, her veil at the hole in the fence, her satchel, with clothing marked with her name, found floating in the river.    All these are facts, standing in close relation to the crime, and go to make up the *res gestæ.* The note was admissible, because it was written by the deceased shortly before her death.    But when admitted, the envelope bears the name of the plaintiff in error; the weight it then becomes entitled to, as regards the main question, is a question not to be discussed in this connection.    It bears the name of the man who is proved to have been in her company shortly afterwards, and it points in plain words to a speedy meeting between the writer and the person who bears the name on the envelope. The note can be excluded upon no principle which would not exclude the evidence of her alleged cry for mercy shortly after, when she met her fate.    Greenleaf on Evidence, 14th ed., vol. 1, § 108; *Hunter* v. *State*, 40 N. J. Law, 495; *Hayden's Case*, 9 Reporter, 271; *Lund and Wife* v. *Inhabitants of Tyngsborough*, 9

Cush. 42; report of *Webster's Case* by Bemis, p. 161; *Payne's Case,* 31 Gratt. 855; *Smiths* v. *Shoemaker,* 17 Wall. 630; *Commonwealth* v. *Eastman,* 1 Cush. p. 215.

· The next assignment is as to the refusal of the court to grant a new trial upon the ground that the evidence is plainly insufficient to warrant the finding against the plaintiff in error, and that the existence of the crime, the *corpus delicti,* is not established by the testimony. The court in this case has certified *the evidence;* and upon the trial of this writ of error here, this court should consider all the evidence for the Commonwealth, rejecting all the parol evidence offered by the exceptor *which is in conflict with the Commonwealth's evidence.* This rule is essential to anything like stability in judicial decisions. An appellate court is not equipped for the task of passing between conflicting points in evidence on paper. That court does not see the witnesses, nor hear them testify. It can draw no reliable inference from their manner and deportment contrasted with one another; and so when witnesses have contradicted one another before the trial court, and the jury, who saw and heard, and the judge have passed between them in the court below, that judgment cannot be safely disturbed, for on paper they all appear alike. But I do not sanction the proposition that *all the evidence of the exceptor* must be rejected, whether in conflict with that of the prevailing party or not. Such a rule as that strikes too fatally at the root of all appeal in cases at law; and while that idea is sustained by some decisions in this court, I do not consider that it is founded in reason.nor sustained by the best precedents. In early and in many well considered cases the rule is established, as I have stated it, and it is sustained by reason, to reject uncontradicted evidence, or the testimony of uncontradicted and unimpeached witnesses, appears to be unreasonable and irrational. *Keys* v. *M'Fatridge,* 6 Mun. 18; *Bennett* v. *Hardaway,* 6 Mun. 125;

*Carrington* v. *Bennett,* 1 Leigh, 382, 384. Opinions of Green and Coalter, J. J., in a court of three; Brooke, P., and Cabell, J., not sitting. In this case all the judges reviewed *Bennett* v. *Hardaway, supra,* Judge Carr differing from the majority, holding that the certificate of the court was a certificate of evidence, and was not reviewable by this court. But the court, through the majority, held otherwise, and reviewed and reversed the judgment, one of the majority (Coalter, J.) saying: "Where the evidence is not contradictory, where there is no contest about credibility, the court and jury must each weigh the evidence, whether positive or circumstantial, and must each, within their respective spheres, pronounce upon it. If this be correct, then, either no appeal lies to correct an error in refusing or granting a new trial in such a case, or it must be done in the manner in which this case is brought before us. I am of opinion that the current of decisions in this court warrants the appellate tribunal, in a case properly made out, as this is, in revising the decisions of inferior tribunals refusing to grant new trials." This case was decided in 1829.

In the case of *Ewing* v. *Ewing,* 2 Leigh, 366, decided the next year, Brooke, P., was still absent, and Coalter, J., was also absent, with Cabell, J., present, with Carr and Green, J., J. Carr, J., said: "In *Carrington* v. *Bennett* I have given my view of that case (*Bennett* v. *Hardaway*), in which I was *overruled* by my brethren; they thought the only effect of that case was that it is not competent to a party by way of exception to the refusal of a new trial to refer to the judgment of the appellate court *the credit of the witnesses,* and that, *therefore,* the exception should contain the *facts* which the trying court considered as proved, not the evidence by which they were proved; that this rule applied to cases where there is *conflicting evidence; but that where the facts are not directly proved, but must be*

*inferred, the* appellate court *must have the facts proved in order to make the inference.* I cannot but think that this decision curtails of its fair proportions a case which was very solemnly considered by this court." *(Bennett v. Hardaway.)* Green, J., referring to his opinion in *Carrington v. Bennett*, says that his opinion is that the true principle is "that a party shall not be permitted to so frame a bill of exceptions as to *refer the credit of the witnesses to the appellate court."* And again, "In that case *(Bennett v. Hardaway) the testimony of the witnesses conflicted*, and the just decision of the case depended upon *the degree of credit* due to the witnesses, respectively, of which the appellate court had no criterion, such as the trying court had, upon which to form any judgment. But in the present case there is no such difficulty for crediting or discrediting all or any of the witnesses *ad libitum;* there is no evidence whatever which justifies the verdict." Cabell, J., took occasion to approve the decision in *Carrington v. Bennett*, although he did not sit in it, and stating a case where the evidence was certified, said: "This court would not have to *decide* on the *credit of witnesses;* it would proceed on an admission of their credit." Carr, J., in *Ewing v. Ewing* having waived his views in *Carrington v. Bennett* for a full court, found the opportunity in a few years in the case of *Green v. Ashley*, decided in 1835, and reported in 6 Leigh, 143. In this case all the evidence was on one side, and that the prevailing side in the court below, the party excepting having no evidence; and there being no conflict in the evidence, nor any doubts as to the credit of the witnesses, the judgment of the lower court was reversed. Brockenbrough, J., speaking for the first time in this court upon this question, after reviewing the cases which I have briefly examined, said: *"Evidence admitted to be true, seems to me to be in no wise different from facts proved."* Evidence admitted to be true, and

evidence not denied or contradicted in a disputed case, are not very dissimilar in force and effect.

Carr, J., citing the decision of the court in *Carrington* v. *Bennett,* in which he was overruled, and *Ewing* v. *Ewing,* in which he reserved his opinion for a full court, said: "According to these decisions we must receive the exception here as well taken, for the evidence is all on one side, and there cannot be a question of the credit of· witnesses." Cabell, J., said: "I am clearly of opinion, upon the authority of the cases of *Carrington* v. *Bennett* (in which he did not sit), and in *Ewing* v. *Ewing* (in which he did sit and gave the casting vote between Carr, J., and Green, J., and approved the decision in *Carrington* v. *Bennett*), that the exception to the opinion of the court overruling the motion for a new trial was properly taken, there being *no conflict in the evidence, which was all on one side, and against the party* tendering the exception; and that in such a case it is competent to this court, *and it is its duty,* to deduce from the testimony *all such inferences of fact as the jury might have deduced from it;*" and I will add, did deduce from it what the jury *might have* deduced from it, *but did not* deduce from it.

Brooke, J., took the opposite view, and held that *Ewing* v. *Ewing* presents a new mode of trial not to be found in any of the books, and more congenial with the civil than the common law. Tucker, P., however, approved the decision in *Ewing* v. *Ewing,* and the case was reversed, although the *evidence was certified, and was all* offered by the prevailing party in the court below, and none by the exceptor. See also *Rohr* v. *Davis,* 9 Leigh, 30.

In a late case decided in this court—*Goodman* v. *The Railroad, ante* p. 576—the verdict was for Goodman; the railroad offered no evidence; the judge set the verdict aside, and final judgment was entered ·by *the judge* upon the evidence offered by Goodman alone, in favor the railroad company. This court

reversed the circuit court of Richmond city in that case. It did not review the case upon the principle that all the evidence of the exceptor should be rejected. If it had, the appellant would have been dismissed from this court with an adverse judgment to him, and the judgment of the court below affirmed, for there was no other evidence in the case but his; and if all the evidence except that of the prevailing party had been rejected, there would have been nothing in the case but the judgment of the court below, which could not have been reversed without evidence. That case is the converse of the case of *Green* v. *Ashby*, 6 Leigh, 135, where all the evidence was offered by the prevailing party.

In the case of *Goodman* v. *The Railroad*, there being no conflict in the evidence and the credit of the witnesses not being involved, there being nothing to contradict them, this court drew different inferences from this uncontradicted evidence of unimpeached witnesses, from those which were drawn by the trial court, and reversed the judgment of that court, although that court heard the witnesses testify, saw their manner, bearing, deportment, &c., and may have thought proper to disbelieve them all, and everything they said, yet this court, as they were uncontradicted and unimpeached, was of opinion to credit their testimony, notwithstanding the views of the court below. See the opinion of Judge Fauntleroy in that case.

The opinion in *Gimmi* v. *Cullen*, 20 Gratt. 439, has led to some confusion on this question, I think, for while in the main it followed some of the decisions of this court. In discussing the question the learned judge uses the language of Judge Carr (the overruled judge) in *Carrington* v. *Bennett*, and likewise as to *Green* v. *Ashby*, where, as we have seen, Judge Carr yields his views to the views of a full court, and the intimation seems to be, and it is argued to show, that Judge Cabell and Judge

Tucker concurred in the views of Judge Carr. However this may be, *Gimmi* v. *Cullen* is in conflict with *Goodman* v. *The Railroad,* cited above.

In *Gimmi* v. *Cullen* it is said: "The rule, therefore, is, that where all the evidence is introduced by one party, and the verdict is in his favor, the *other party* may have a refusal to grant a new trial reviewed, upon a bill of exceptions certifying the evidence only. In such case, the evidence certified will be considered as true by the appellate court, unless impeached in some way. *But, when the* verdict is against the party who introduced the evidence, *he cannot have* the refusal of the court to grant a new trial reviewed upon a certificate of the *evidence merely:* he must have a certificate of the facts proved. From the evidence certified in the former case, and from the facts certified in the latter, the *appellate court will draw such inference as a jury might reasonably draw.*" This distinction does not exist I think.

Time does not permit, nor is there space within reasonable limits to complete this discussion in one opinion. I have already reviewed the subject and discussed it at some length in the case of *Moses* v. *The Old Dominion Iron and Nail Works, ante* p. 22, although it was not in that case, and it is not in this, the principal question. For the present I will content myself with referring to that opinion and citing for the opposite view *Muse* v. *Stern,* not yet reported, in which, I think, the opinion of Judge Carr in *Ewing* v. *Ewing* is called in requisition as stating that the case of *Bennett* v. *Hardaway* had been shorn of its fair proportions.

The question in *Bennett* v. *Hardaway,* which was decided by the court, was as to whether the bill of exceptions should state the evidence or the facts proved. But the rule now is settled that when the evidence is conflicting so that the court declines to certify the facts, the court must certify, nevertheless, the evi-

dence. *Powell* v. *Tarry, Guardian,* 77 Va. 250.    And the question is, how shall it be considered?    The plaintiff in error, by bringing up the certificate of evidence, waives all of his own testimony of a parol character which is in conflict with the evidence adduced by the Commonwealth.    Much attention has been given to this question because of its importance, while it may be of no very great practical benefit to the plaintiff in error in this case.    But there is no sound principle upon which evidence adduced by him, which is uncontradicted and undenied, should be excluded.

Did the court err in overruling the motion of the plaintiff in error to set aside the verdict and of the jury and grant him a new trial?    Was the evidence sufficient to warrant the finding of the jury?

On the morning of the 14th of March, 1884, the dead body of a woman was found floating in the reservoir of the city of Richmond; opposite to the body, on the bank, the ground was disturbed by confused tracks.    When the body was taken out of the water a shoe, removed from one of her feet, fitted the smaller tracks, which appeared to be the tracks of a woman, the other tracks were those of a man.    Near the tracks were a glove and a broken shoestring; just outside of the enclosure of the reservoir grounds a veil and another glove were found. The inquest showed that the deceased was not dead, but at least partially insensible when her body came into the water; her hands holding tightly clasped lumps of mud from the bottom of the reservoir.    This led at first to the suspicion of suicide.    But when it was disclosed, upon close examination, that she was with child, and within one month of its birth in the ordinary course of nature, which would have rendered it very difficult for a person of her height (four feet eleven inches) to have gotten over the picket-fence, finished with sharp points, three feet four inches high; and when it was discovered that

she had received a blow over the eye which had broken some of the blood-vessels under the skin and caused a suffusion of blood on the brain, and that there was a bruise upon the mouth 'of a character which indicated pressure, and several scratches on her face, the theory of suicide was abandoned by the authorities; and the indications pointing to murder, diligent search was set on foot in all directions. A watch-key was found near the hole in the fence, through which the tracks indicated that she had entered the grounds in company with a man ; a bonnet was found concealed in a wooden building near by with specks of red lint on it, sand inside; and a red shawl, which was supposed to be hers, was obtained, which had been found on the morning of the 14th of March on a yard fence in the line of approach from the city to the reservoir. It was then discovered that a person answering her description had been at one of the principal hotels in the city on the 13th of March, and had left without paying her bill, and soon her body was fully identified at the morgue and delivered to her friends.

Suspicion pointed to the plaintiff in error, in the minds of those who knew them both; and the note addressed by the deceased to the plaintiff in error at the hotel, in reply to one she had received, was found in the waste-basket at the office of the hotel, and a search of the hotel registers in the city disclosed the fact that the plaintiff in error was registered at one of the hotels on the 12th and 13th of March. A warrant was issued for the plaintiff in error, and executed at his home in King and Queen county. When arrested, the plaintiff in error, being told that he was to be arrested under a warrant then in the hands of an officer who proceeded to make the arrest, remarked : For me! ridiculous! And when told it was for murder, did not enquire for the murder of whom, but coolly and politely said, Come in and let us have some supper ! The officer then noticed hanging from his watch-chain a short

charm-chain without a pendant. When searched in Richmond this charm-chain had been detached and secreted. When asked about it he denied that he had ever had such a thing; but when closely pressed said his brother had it, and his brother delivered it to the officer after an interview with the plaintiff in error. When he was arrested he denied having seen the deceased while she was in Richmond, although he said he had been in the city at that time; started to leave the house without his hat, and finally insisted upon wearing his brother's hat instead of his own. When he reached the station-house in Richmond one of the officers observed scratches on the back of his hand, partially healed; the scratches are described in the evidence as such as would be made by finger-nails, or something of similar shape. These scratches of themselves would amount to very little, but the plaintiff gave contradictory accounts of them, saying he hurt his hand upon a car-railing; that he had an eruption on his hand, hastily catching at the suggestion of another that he had an eruption on his hand; and still again, offered evidence in his defence giving a different account still of the injuries, and while surrounded by a crowd, "he dodged his right hand about so as to attract attention," put it in his pocket, put it on his knee palm up, and hung it under the chair. These movements are pregnant with the suggestion that these scratches were badges of shame in some way. Murders have been uncovered in other cases by trivial injuries inflicted by the dying man upon his slayer; in one case of robbery, the victim striking the assailant in the face with a key, the wards of the key made a mark, which proved a fatal badge. These scratches in this case may be connected with the *stifled scream at the reservoir*, and the bruise upon the mouth of the dead body, which seemed to have been made by pressure.

Notwithstanding the denial of the plaintiff in error that he

saw his cousin on the 12th or 13th of March, it is clearly proved that he was with her on several occasions on the street and at the iron-works on Belle Isle on the 13th of March; and there is a good deal of evidence tending to show that he was with her up to a late hour that night in close proximity to the scene of the death. If his relations with her were innocent, why did he so positively deny seeing this cousin of whom he claimed to be so fond? If the scratches were the result of an innocent accident, why conceal them and give conflicting accounts of them; and if the watch-key found so close to the scene of the death was not his, why did he take off and conceal the little charm-link or chain to which he had been accustomed to carry a watch-key attached? If he was not at the scene of the fatal event, where was he? How does it happen that in a city where he was so well known as to be identified by comparative strangers on the main thoroughfares of the town that nobody saw him who could identify him during the hours of that fatal night of the 13th of March? How did it happen that a letter written by the deceased apparently (and so dated) on the 14th of March, when she, the writer, was cold in death, sent a message of love to him, as if he were absent? He cannot now deny that he saw her on the 13th of March. She did not write the letter on the 14th of March; she was then dead. If the letter was written on the 13th of March, and that was the only day she was in Richmond alive, having arrived very late on the night of the 12th, after 2 o'clock at night, why did the writer send him a message when he was with her? These questions have answers readily suggesting themselves; but what is his answer, what answer does the defence give?

The deceased was soon to be a mother; was shortly to give birth to a child of shame! Was he the guilty partner in the unfortunate situation? I am not prepared to say that he was

the only person who could have been the cause of this condition of the woman; that he was the only person who had the opportunity to seduce his cousin; for the evidence shows that she had other male acquaintances, and she had wrenched herself loose from parental control and had left the parental roof, and had involved her friends in difficulty by her imprudence toward other men. But he seems to have been the only one of them all who knew of and awaited her coming; while she was belated by a delayed train—she was to have been there on the 12th of March—he was there on the 12th of March. She was in Richmond on the 6th of January preceding, and he was there on the preceding 6th of January, and fixing his finger on the hotel register at her assumed name, asked to see her, and they two left the hotel together under circumstances suggestive of undue intimacy. When she left the hotel toward night-fall and remained out all night, where were they then together? He alone knows, for she is now dead. They were cousins, and he had been accustomed to visit her wherever she went; and the evidence draws a familiar picture of them as young lovers, "walking about together always, and looking at the flowers." His letter to her advises her to marry another, and that other, however worthy a man, an illiterate person who could not write his name, perhaps, as he employed the services of another to write his letters to her. It cannot be denied that he had the opportunity to seduce her, and his constant communication with, and his assignations with her in her advanced stages of pregnancy, certainly point a strong suspicion toward him as her seducer. In this state of affairs the evidence shows him to have been engaged to marry another; the ring in his pocket-book, marked "T. to N., *amo te*," does not bear the impress of a pledge of love between him and his former love. Who, then, had a motive, such a strong motive, to desire her death? Who, beside him, had any communication with her

on her last wretched day on earth? The evidence shows him in her company and in charge of her on that day; to whose care does *he claim* to have consigned her? Is there any hypothesis—any reasonable hypothesis—consistent with his innocence? No person saw the fatal blow struck which rendered her insensible and helpless. It is a train of circumstances only, but a train of circumstances which seem to bind him with fatal effect to the commission of the crime—the guilty act. He claims that circumstances should be strong, and that circumstantial evidence should be received with great caution, before it is held sufficient to forfeit his life. This is true; but circumstantial evidence is allowed to prevail to the conviction of an offender, not because it is necessary and politic that it should be resorted to, but because it is, in its own nature, capable of producing the highest degree of moral certainty in its application.

Fortunately for the interests of society, crimes, especially those of great enormity and 'violence, can rarely be committed without affording vestiges by which the offender may be traced and ascertained. The very measures which he adopts for his security not unfrequently turn out to be the most cogent arguments of his guilt.

On the other hand, it is to be said that this is a species of evidence which requires the utmost degree of caution and vigilance in its application, and in acting upon it the just and humane rule impressed by Lord Hale cannot be too often repeated, *tutius semper est errare in acquietando quam in puniendo, ex parte misericordiae quam ex parte justitiae.*

If a number of the circumstances which attended a disputed fact be known and ascertained, and these so coincide and agree with the hypothesis that the disputed fact is true, that no other hypothesis can consist with these circumstances, the truth of that hypothesis is necessarily established. And again, the nature and degree of coincidence between the cir-

cumstances and the hypothesis may oftentimes be sufficient to exclude all reasonable doubt, and thus generate *full moral conviction and belief*, although it be not as in the former, of an absolute and demonstrative nature. If on the supposition that a charge is unfounded, the party against whom it is made has evidence within his reach by which he may repel that which is offered to his prejudice, his omission to do so supplies a strong presumption that the charge or claim is well founded. It would be contrary to every principle of reason and to all experience of human conduct to form any other conclusion. This consideration in criminal cases frequently gives a conclusive character to circumstances which would otherwise be of an imperfect and inconclusive nature. A man's motive may be inferred from his acts, and so what his conduct was may be inferred from the motive by which he was known to be influenced. Proof that the party accused was influenced by a strong motive of interest to commit the offence proved to have been committed, although weak and inconclusive in itself, yet it is a circumstance to be considered in conjunction with others, which plainly *tend* to implicate the accused. Thus, when all the circumstances of time, place, motive, means, opportunity, and conduct concur in pointing out the accused as the perpetrator of an act of violence, the force of such circumstantial evidence is materially strengthened by the total absence of *every trace or vestige of any other agent*, although had any other existed, he must have been connected with the perpetration of the crime by motive, means, and opportunity, and by circumstances necessarily accompanying such acts, which usually leave manifest traces behind them. Hale's Pleas of the Crown, 290; Starkie on Evid. 432.

It cannot be said that the verdict of the jury in this case although founded on circumstantial evidence alone, was without evidence, nor plainly against the evidence. The circum-

stances proved pointed with fatal precision to the plaintiff in error; and there is not a circumstance which points to any other person or agent. The theory of suicide finds no substantial support from the proved facts; all the surroundings of the deceased on that dreary and dismal night, remote from human habitation, in that gloomy locality, lead away from suicide, without the proved facts indicating violence to her person, which completely destroy the idea of suicide. The jury were the triers of the fact; they have rendered their verdict of guilty, and the court below did not err in refusing to set it aside and grant a new trial. It is assigned as error that the jury did not find a sufficient verdict, and that the judgment should have been arrested by the hustings court, which was refused upon motion to that end by the plaintiff in error.

The record shows that the prisoner was brought into court, and the jury, having fully heard the arguments of counsel, "upon their oaths, do say that the said Thomas J. Cluverius is guilty of murder in the first degree, as charged in the indictment; and thereupon the said Thomas J. Cluverius was remanded to jail." This verdict is free from objection.

It ascertains the degree of the offence of which he is found guilty, and the record shows that the plaintiff in error was present in court. See *Livingston's Case,* 14 Gratt. 592; *Mitchell* v. *State,* 5 Yerger, 340; 8 Yerger, 514; *Hines* v. *The State,* 8 Humph. 597; *Kennedy* v. *The People,* 39 N. Y. p. 245; *Fitzgerald* v. *The People,* 37 N. Y. 413; *Lawrence's Case,* 30 Gratt. 851.

As to the question raised as to the term of the court at which the trial took place having been extended beyond the month, it is provided by law that the term shall be commenced on the first Monday in the month and continue so long as the business before the court shall require. This term

continuing beyond the day fixed by law for the commencement of the next term, the judge changed the day for the commencement of the succeeding term, which he was authorized by law to do. But however the succeeding term may have been affected, the term at which the plaintiff in error was tried commenced on the day fixed by law and continued as prescribed by law as long as the business before it required.

As to the last assignment of error, the refusal of the court to set aside the verdict and grant a new trial because of after-discovered evidence, in this there was no error. How could that evidence have benefited the plaintiff in error in the light of the circumstances surrounding this case? The circumstance that this note was addressed to the plaintiff in error has ceased to be material, however effective it may have been in pointing suspicion to him. It was proved that he was in the company of the deceased in several places during the day, and if the opinion of the new witness had been of any avail to raise a doubt that the envelope was in a different handwriting, it would have been upon a point which was no longer material, but the character of the evidence offered was inconclusive, and would have been a mere opinion of one not an expert.

Upon the whole case I discover no error in the judgment of the hustings court, and am, for the foregoing reasons, of opinion to affirm the same.

HINTON, J., dissenting, said:

It would seem to be beyond doubt that the power to punish for crime, possessed by all civilized communities, had its origin and source in the inherent right which belonged to every individual, in a state of nature, to secure himself against injury from his fellows, and that it was transferred, in course

of time and in the progress of civilization, from the individual to the sovereign power of the various communities as they came into being. *Rutherforth's Inst.*, chapter xviii; 1 Bish. Cr. Law, section 9; 4 Bl. Com., chapter 1, section 8.

And it cannot be doubted that the prompt and fearless exercise of this power, on all proper occasions, is absolutely essential to the safety and well-being, if not the life of all organized society. Nevertheless, as this right is confined to the use of such means and the imposition of such penalties as the law-making power of the State deems necessary to prevent the recurrence of crime, it is obvious that the right to exercise this power never arises, and cannot be lawfully exercised until there has been a *crime* positively established, and the real criminal certainly found and legally convicted. The exercise of this right, therefore, in any case where there is reasonable doubt, either as to the crime or the criminal, especially in cases of murder, where the penalty is death, can never be justified, and is likely to work irreparable injury to the accused, the defeat of the real ends of punishment, and tend to a want of confidence in the humanity of the law and the due administration of justice. Hence it is, that to meet exactly such cases, the maxim "it is better that ninety-nine (that is an indefinite number of) guilty persons should escape punishment than that one innocent person should be punished," has been wisely adopted. *Johnson's Case*, 29 Gratt. 820; *Smith's Case*, 21 Gratt. 818.

It must also be obvious, that as the *only* ends sought to be obtained by the infliction of punishment are, first, to prevent the criminal and others from the commission of like crimes; and, next, to amend the criminal, that the idea, sometimes advanced by the unthinking, that a person charged with a specific offence may be rightly punished for some other offence, or for general depravity, or that the offence actually committed,

although separate and distinct from the one with which he is charged being equally heinous, he may be properly punished for the offence not charged, in order to rid the community of him, has no place in the criminal jurisprudence of this or any other country.

And as it is the bounden duty of each judge of this court, in every case, properly here, to carefully examine the proceedings of the lower court, and if he finds that there has been a mistrial or failure of legal justice, either because the prisoner has been denied any, even the least important of the safe-guards, which the law has justly and mercifully thrown around him, for his protection, or that the jury have reached an erroneous conclusion upon the evidence, or that he has been prejudiced in any other respect, so to declare, I shall offer no apology for dissenting in this, the first case in this court, so far as I can recall, in which a judgment of affirmance has been entered without at least three of the judges being able to agree in all the reasons by which their conclusion was reached, and shall proceed to state as briefly as I can the grounds which, in my judgment, clearly entitle the accused to a new trial.

The first error of which the accused has the right to complain, is the rejection of the juryman Larke. As appeared by the first bill of exceptions, after twelve *veniremen*, among whom was the *venireman* Robert W. Larke, had been examined upon their *voir dire*, and accepted by the court as competent jurors, but before the panel had been completed and before said jurors had been sworn to try the cause, the attorneys for the Commonwealth challenged the juror Larke, upon the ground that he had previously stated that he "would not under any circumstances convict a man upon circumstantial evidence." And they then introduced, in support of their challenge, two witnesses, who testified in substance as follows: That in a conversation held with the juror a week or ten days

before, begun about this case, but which had drifted into a talk about crime generally, the juror Larke made the remark above mentioned. Whereupon, Larke took the stand and stated, under oath, that he had forgotten about the conversation, and could not recall the words he had used. What "I meant," said he, "by what I said was, *that a man ought to be very slow and cautious in convicting a man on circumstantial evidence.* If this case presented an unbroken chain of circumstantial evidence, fully proved, *I would convict him,* if I was convinced. I don't remember having said that I would under no circumstances hang a man on circumstantial evidence. *I didn't intend to say that I wouldn't convict a man in any case of circumstantial evidence, but I would be very cautious in doing so.* I made the remark in a general way." Now, it is undoubtedly well settled that no person who has conscientious scruples against the infliction of the death penalty, or who is conscientiously opposed to convicting in a capital case on circumstantial evidence, is a competent juror in any case where the penalty may be death, for the reason that every one, in order to be a competent juror, must be in a condition of mind to find a verdict in accordance with the law and the evidence. To place any one entertaining such scruples upon a jury, and go through the forms of trial with the almost certain result of a mistrial, would, therefore, be a mockery of justice and a prostitution of the law, which no court could for a moment tolerate. But this principle has little or no bearing upon the case of this juror. It is not pretended that this juror had any scruples against the infliction of the death-penalty, nor can it be claimed, upon any fair interpretation of his sworn statement, taken as a whole, that he has conscientious scruples against finding a verdict of guilty in a capital case on circumstantial evidence; for viewing his statement in the proper light, it is nothing more nor less than a direct assertion that, although he would

be slow and cautious in convicting in such a case, yet, that *he would convict,* if convinced of the guilt of the accused, by an unbroken chain of circumstances *fully proven.* It is true that in all likelihood he did make, in the course of a conversation, in which he was very properly combatting the propriety of forming an opinion upon newspaper accounts of the evidence, the remark attributed to him, but the evidently honest disavowal in open court of such a want of faith in the probative power of circumstantial evidence as the use of that language imputed to him, and contained in the declaration, "I didn't intend to say I wouldn't convict a man in any case of circumstantial evidence, but I would be very cautious in doing so," would seem to imply, coupled with the fact that he had forgotten both the utterance and the occasion on which it was made, shows that it was nothing more than the inconsiderate remark of one who, in an idle moment, has given expression to a sentiment which he did not feel, and to a purpose which he never entertained. Of him, it may be said, as was said of another juror by the court in *State* v. *Dicken,* 35 La. An. 66, "his answers given under the sanction of an oath are certainly a better and a safer test of his competency as a juror than the thoughtless remark referred to." It is not pretended that he was biased either for or against the accused, or that he had conscientious scruples against the infliction of the death-penalty. Unless, then, his views as to the way in which circumstantial evidence should be regarded are wrong, he was a competent juror.. That his views on this subject were not wrong seems clear from the following quotations. In *Algheri* v. *State,* 35 Miss. R. 584, the high court of errors and appeals of that State, held: 1st. That in the application of circumstantial evidence to the determination of a case, the utmost caution and vigilance should be used. 2d. That it is always insufficient, when assuming all to be proved, which the evidence tends to prove, some other hypothesis may still be true, for it

is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth; and 3d. That where the evidence leaves it indifferent which of several hypothesis is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, *however great the probability may be.* The second and third of these propositions, says Moncure, P., speaking for the whole court in *Johnson's Case*, 29 Gratt. 817, were literally taken from 1st Starkie on Ev. 572, and correctly expound the law. In *Dean's Case*, 32 Gratt. 912, this court held, as the syllabus of the case will show, that circumstantial evidence must always be scanned with great caution, and can never justify a verdict of guilty, especially of murder in the first degree, the penalty of which is death, unless the circumstances are of such a character and tendency as to produce upon a fair and unprejudiced mind, a moral conviction of the guilt of the accused beyond all reasonable doubt. And in that case, Christian, J., speaking for the court said: "We are painfully aware that this is a case of purely circumstantial evidence; and we have therefore given to it the most careful and anxious consideration. And looking with the closest scrutiny to all the facts and circumstances proved, we find them, when combined, utterly inconsistent with the innocence of the accused, but consistent with no other reasonable hypothesis but that of his guilt. *When these things concur*, the force of circumstantial evidence becomes as potent as that of direct evidence."

And Wills, in his book on Circumstantial Evidence, quotes, with approval, the language of Mr. Justice Bayley, in *Rex* v. *Downing*, that "Where there is nothing but the evidence of circumstances to guide you, those circumstances ought to be *closely and necessarily* connected, and to be made as clear as if there were absolute and positive proof."

Such being the law in cases of this character, it must be

perfectly apparent to every unprejudiced mind that Larke was a competent juror ; that he thoroughly understood the temper in which a juror should consider a case supported by evidence purely circumstantial, and that such was the peculiar frame of his mind that he was especially fitted to act as a juror in cases of that kind.

It is a matter of utter impossibility to accurately estimate or ascertain the value of such a juror, in such a case, especially if, as usually happens, the feelings of the public are deeply aroused against the supposed perpetrator of the crime.    The exclusion of such a person from the jury is manifest error to the prejudice of the prisoner, and accordingly we find it, as we would naturally expect, laid down in *Montague's Case,* that in every such case it is unnecessary to inquire whether the prisoner has been prejudiced by the illegal exclusion of the juror, "because, in the opinion of this court, where any legal right has been denied to a party on trial for a criminal offence, any of the safe-guards thrown around him by law for his protection has been disregarded, it is not for this court to say what might or might not have been the effect upon the case of the accused, but will reverse the judgment and remand the case for a new trial.    And if it be necessary, to enable him to exercise his right to have the judgment of the court reviewed in the appellate tribunal, the law will intend prejudice, and will hold it impossible, in such a case, to say that a fair and impartial trial has been had."    And such is the settled law of this State ever since that case.

It is, however, contended that if the court did not have the right to exclude Larke from serving as a juror upon this ground that it did have the right to discharge him, because, after he had been challenged by the State, he stated to the court that he was over sixty years of age ; that he had not remembered it when examined on his *voir dire,* and that if it

was not now too late he claimed his exemption from service on the jury on that ground.    And such was my first impression, but subsequent reflection has satisfied me that I was entirely mistaken.    Larke's right to be exempted from jury duty on this ground was purely a personal privilege, which he had the right to exercise up to the time that he was accepted by the court. By his failure to claim his exemption before he was accepted I think he waived his right.    Logically, his right to exemption ceased when the court accepted him, and his subsequent effort to get the benefit of an exemption which he had waived did not constitute such a cause as the court had the power to discharge a juror for.    But, besides this, it is certainly a well recognized principle of law that courts, even while exercising their admitted functions, must so exercise them as not unnecessarily to prejudice the rights of the accused.    In this case it distinctly appears that this juror was discharged in the presence of at least four persons who had been examined on their *voir dire*, and who subsequently served as a part of the jury without indicating, so far as this record shows, the ground of his dismission.    Under these circumstances, it was the duty of the court to have stated the ground upon which he was discharged.    The failure to do so was certainly well calculated to mislead at least these four jurymen, if not others who may have been present.    Because, for aught that appears, each of those persons might well have supposed that Larke was discharged, *not* because of his claim to be exempt from jury duty, but because of the caution with which it was evident he regarded circumstantial evidence, and this may have caused them to scan less closely the circumstances of the case and to attach more importance to those circumstances than they would otherwise have done.    To say the least, it is highly probable that the prisoner has been prejudiced by the failure of the court to state the ground upon which he rejected the

juror, and equally probable, nay, certain, in my judgment, that a person was excluded from the jury that tried the case who was eminently qualified to serve as a juror in just such a case as this is. In *Montague's Case,* 10 Gratt. 769, this court reversed the judgment because it appeared that the lower court had discharged a juror because, being a neighbor of the wife and family of the prisoner, who lived on the lot adjoining his residence, he stated to the court that he was unwilling to trust himself under the circumstances, there being great intimacy between his and the prisoner's family, although the juror stated at the same time that he had no prejudice for or against the prisoner, and could render a fair and impartial verdict on the evidence which might be adduced. In that case, the court held that while the trial court may examine a juror on oath and in the exercise of a sound discretion discharge him, yet that if it shall appear that the court erroneously exercised its discretion in discharging such juror without good and sufficient cause, that it is matter of exception on the part of the accused for which the judgment of that court should be reviewed and reversed. And so I hold here upon what I conceive to be very much stronger ground.

But four cases are specially relied upon by the attorneys for the Commonwealth in their brief, and by Judge Fauntleroy in his opinion, as sustaining the action of the hustings court. After a careful examination of these cases, however, I can discover nothing in either or all of them which militates in the slightest degree against the views presented herein, as a brief reference to them will show.

In the first of these cases, 15 Tex. App. 534, the challenged juror admitted upon his examination in court that on the previous day he had had a conversation with the defendant with reference to his case, in which he said to him that he hoped or believed (he did not remember which word he had used) that

he the defendant would come out all right. Whereupon he was challenged by the State for cause, and required by the court to stand aside. In that case the juror was evidently regarded as biased in favor of the defendant.

In the next case, *Metzger* v *State*, 18 Fla. 486, it distinctly appears that the juror was rejected in obedience to the express mandate of the statute of that State, which says that "no person, whose opinions are such as to preclude him from finding any defendant guilty of an offence, punishable with death, shall be compelled or *allowed* to serve as a juror on the trial of such an offence;" and the chief-justice in delivering the opinion of the court, after reciting the words of the statute set out above, said: " Here is an express statute disqualifying those whose opinions are such as would prevent them from convicting persons of capital offences from sitting on juries in such cases. Here two persons made oath in his presence (meaning the presence of the judge) that Hoke (the juror) had said that if he were on the jury he *would not go* for capital punishment; in other words, he would not be an instrument of inflicting the penalty of death, *and he makes no denial of the charge that these were his opinions.*" In that case the objection to the juror was that he was opposed to capital punishment, and he does not say before the judge either that his views had undergone a change or that he never meant what he had previously said. What similarity, may I then be permitted to ask, can there be between that case and this? What similarity can there be between a juror, who is opposed to capital punishment, no matter how cogent and full the proof may be and one, who simply says he will do, in a case of circumstantial evidence, what the law requires him to do in such a case—namely, scan the evidence closely and only find a verdict of guilty if the chain of evidence is unbroken and the proof full and convincing?

In *State* v. *Ward*, 39 Vermont R. 231, the juror, upon being

interrogated in respect to his views of capital punishment, declared he had conscientious scruples against rendering a verdict of guilty in a case where the punishment was death, and that he believed the law inflicting the punishment of death was wrong.    He was thereupon discharged, because the court did not regard him as an impartial juror.    But what possible analogy can there be between the case of that juror and a juror who does not object to the death penalty, but only requires what the law exacts, an unbroken chain of circumstances directly connecting the accused with the ultimate fact to be proved—to-wit: the violent death of the person supposed to have been murdered—before he will render a verdict of guilty.

In *Waller* v. *State,* 40 Ala. 325, the juror was set aside for having a fixed opinion against capital punishment.    The court, however, saying that to act or to decline to act in such a case *as this* is not error (meaning in the lower court).    Thus in effect, saying that it would not have been error under the statute of that State for the lower court to have allowed the challenged juror to remain upon the jury, unless challenged by the State's attorney for cause.

Having thus stated what, in my judgment, these cases really decide, it seems almost a work of supererogation to add that I am unable to perceive that they even tend to sustain the action of the trial court in this case.    Neither one of them asserts the doctrine that a person would be incompetent to sit as a juror merely because he would require convincing evidence before he would convict in a criminal case depending upon circumstantial evidence, and neither of them establishes the power of a court, *in this State,* to discharge a juror after he has been examined upon his *voir dire,* has answered satisfactorily and been accepted, merely because he says that he is over sixty years of age, and claimed his exemption from service on the jury on that ground, *if it was not too late.*

The next error committed, as I conceive by the court below, was the admission of what is known in the record as the "Laura Curtis letter." It is in these words:

"RICHMOND, VA., March 9th, 1885.

"*My Dear Lillie,*—It is on business of sad importance I must write to you to-day, as you know mama, both mama and Aunt Mary have both been in wretched health for a long time, and both have been getting worse for some time, and the doctors say if Aunt Mary don't leave here, and that soon, she cannot stand it long; so they advise papa to take her to Old Point, in order that she can take those sun-baths, which are proving so beneficial to consumptives. But she will not agree to go unless I go with her, which, of course, is out of the question, as mama is too ill for me to leave her, so we have been trying to persuade her to let some one else accompany her. So, at last, she agrees that if we can get you to come down and go with her, she will consent to go. Of course we told her you were teaching, but she begged we would try to get you to come and go with her just as company for her, as her nurse will go with her, who has been waiting on her all the time. She says the reason she wants you to be with her is on account of your being so quiet and gentle in your manners when you were visiting us, and she is so nervous she could not bear to have some one with her who was not gentle and kind. She told me to beg you please to grant her this request, as it was her last resort for momentary relief from her sufferings, as of course, we know she can never be well. My dear Lillie, imagine how it is with me, my dear mama and aunt both so sick. Mama is rapidly declining, I think, and aunt worse, I think; but if she can get to Old Point we hope she will get better. She will only stay there one week, as in that time the doctors think she will be better, if it will benefit her at all.

Lillie, please come. Ask Mrs. Dickinson, I say, please excuse you under these sad circumstances, just for a week, and she will do it, I know, as you wrote me she was so good and kind. Papa wishes me to say to you, if you will come and go with aunt, he will never forget your kindness, and, besides, he will pay all your expenses and $2 per day for every day you are with her. He is such a devoted brother to her he would do anything in his power. Lillie, don't get any dresses for the purpose, as you and myself wear the same clothes, and as we wanted, if possible, to attend the exposition, I have had made up a lot of new clothes for the purpose, but, of course, now we can't go, but we were in hopes mama and aunt would get better, so we could go, but we have given it out now. Now, dear Lillie, we are in hopes to see you soon. If you will accompany aunt, come Thursday (12), either on the mail or express; we shall send to meet you; and please, dear Lillie, don't disappoint us, for you know there is nothing I would not do for you. If aunt should get too ill to go, we will telegraph to you, so you will get it before time for you to start the 12th. If you will ask the lady you teach for to excuse you for just this short time, she will do it I know. All send much love; aunt is very nervous to-day.

"Ever your loving schoolmate,

This letter is signed: "LAURA M. CURTIS."

This letter is proven to be entirely in the handwriting of the deceased, and it is, admittedly, untrue in every line and sentence.

There is not one *particle of evidence* in the record to show that he ever saw or knew of it. And the proof, at the trial, establishes beyond a doubt that she did not go to Richmond for the purposes indicated in that letter. It was therefore, unless connected with the prisoner in some way—and the proscution's efforts to supply such connection by presumption—nothing

more nor less than a base forgery, conceived and executed by the deceased, and palmed off upon Mrs. Dickinson, the lady with whom she was living, as an excuse for leaving her house.

It was admitted by the court, and allowed to be used by the prosecution as evidence to establish two things: first, a conspiracy between the accused and the deceased to deceive Mrs. Dickinson; and next, a deliberate purpose, *on the part of the accused,* to bring the deceased to Richmond, in order that he might have an opportunity to murder her. That it prejudiced the accused, cannot be doubted. As the fifth bill of exceptions says, the court permitted " the letter to be read as a part of the statement made by Miss Madison to the witness as *explanation and preparation* of leaving her home in Bath county for Richmond." It was argued here that being the reason assigned by her for leaving Bath county, it was "*the inducement to or the cause of coming,*" and so admissible as a part of the *res gestæ.*

Now, the precise meaning of this language is not very clear. But that is immaterial, for it matters not in what aspect the argument for the State is viewed, it will be found to be unsustained by the authorities, even those cited for the State, as I shall now proceed to show. In vol. 1 Whart. Law on Evid. sec. 258, that author says: "The *res gestæ* may be therefore defined as those circumstances which are the *undesigned incidents* of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or by-stander; they may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act, necessary in this sense, that they are part of the immediate preparations for or emanations of such act, *and are not produced by the calculated policy of the actors.* In other

words, they must stand in immediate causal relation to the act—a relation *not broken* by the interposition of voluntary individual wariness, seeking to *manufacture* evidence for itself."

In *Hayden's Case*, 9 Reporter, p. 237, Park, C. J., in his charge to the jury, in substance said, that the declarations of the deceased that she was going to the place where she was subsequently found murdered, to take "quick medicine" to be given her by the accused in order to procure an abortion, made while in the act of going, are competent to characterize her act of going; and the declaration and the act thus united becomes *a fact* in the case. In this case the deceased, when found in the woods, had ninety grains of oxide of arsenic in her stomach and her throat cut; the jury, therefore, very properly concluded that the party, as the judge in his charge said, who administered it to her, must have met her by appointment, for he must not only have had the arsenic but a *vessel* of some kind in which it was prepared to be administered. This case is cited by Wharton in his book on Criminal Evidence in support of the doctrine, that evidence of the statements of the deceased, at the time of the attack or *so soon afterwards, as to preclude the hypothesis of concoction or premeditation*, charging the defendant with the act, may be received. In *Hadley* v. *Carter*, 8 N. H. 40, which was a suit brought against a person for enticing away the servant of another, the court held that the declarations of the servant, made at the time of leaving, and showing he left of his own accord, were admissible as evidence. In the course of the opinion, Upham, J., said: "In this instance the servant at the time of preparation for leaving disclosed causes for such a design of a character strongly implicating himself and *tending to negative entirely any suspicion of intentional misrepresentation of his true motive.* He communicated this design in connection with the fact of asking advice, what course to pursue, and accompanied his declarations of the motive

assigned with the act of leaving. The declaration, then, is so connected with the fact as to give character to it, and the fact carries with it at the same time in the declaration evidence of the motive."

In *Hunter* v. *State*, 11 Vroom, 495, the man, afterwards murdered, made statements to his son and wrote a note to his wife, a few hours before leaving home on the night of the murder, to the effect, that he was going to the city of Camden on business, *and that the prisoner was going with him.* In this case, the court held that such statements, both oral and written, were admissible as explanations and preparations of the act of going from home. In the course of the opinion Bersley, C. J., after saying that it was the usual information that a man about leaving home would communicate for the convenience of his family, the information of his friends or the regulation of his business, makes use of this language, which seems to have been omitted in the brief of the counsel for the Commonwealth : " At the time it was given such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong, and the attitude of affairs at the time *entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed."* After quoting with approval Mr. Wharton's definition of *res gestæ*, he proceeds: "This definition obviously embraces the declarations now challenged, for they were immediate preparations for the act in question, and *were certainly not produced by the calculated policy of the actor who gave utterance to them."* Again, at page 450, he says: "It is principally from the foregoing considerations that I find myself constrained to think that the declarations under discussion, even if they stood in the case unsupported or unaffected by other circumstances, were admissible, on general principles, on the single ground that they were the *natural* and *inartificial* concomitants of a

probable act, which itself was a part of the *res gestæ.*    In such a status of the evidence I should think that the exception to the principle that rules out hearsay, *had been carried to its extreme limit,* but without transcending such limit."

In this connection it must be stated that both counsel and Judge Fauntleroy have entirely misapprehended the meaning of the word "preparation," as used in their quotation from section 753 of Whart. Cr. Ev.   The word is there with reference to preparation on the part of an accused for an attack, for example, as providing himself with a pistol, &c., as the cases cited in support of that statement in the note to the text will show.    Now, these are the authorities relied on to sustain the admission of this letter, and yet it must be apparent to every dispassionate mind that they not only fail to justify its admission, but, by necessary implication, forbid it.   Running through all of them may be seen the same general idea—that is, that such declarations constitute a part of the *res gestæ only* when they are the natural and undesigned incidents or concomitants of a particular act, the nature of which it is necessary to enquire into.    This idea that the declaration must be *truthful,* and not *fabricated,* is illustrated with great force and clearness by several cases in this State.    In *Hill's Case,* 2 Gratt. 594, the court, in discussing the admissibility of the declarations of the deceased, after citing the case of *Rex* v. *Foster,* and one from Skinner, said: "All that is necessary, according to these cases, to make the declaration part of the *res gestæ,* is that it should be made recently after receiving the injury and before he had time to make up a story or devise anything for his own advantage.    Tested by this rule, the statement referred to is clearly admissible."

In *Kirby* v. *Commonwealth,* 77 Va. 689, Lewis, P., speaking for the court, said: "Here the declarations in question were not only made recently, but probably within two minutes after

the shot was fired. And this, taken in connection with the declarant's condition, mental and physical, produced by the unexpected, unprovoked and, as he supposed, fatal shot through the head, repels the idea that his declarations *were fabricated.* Indeed, under the circumstances disclosed by the record, it is hardly reasonable that they could have been fabricated, as both the time and capacity for reflection were wanting."

In Wharton's Cr. Evid., sec. 262, the author says: "*Res gestæ* are events speaking for themselves through the instinctive words and acts of participants—not the words and acts of participants when narrating the events. What is done or said by participants under immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks."

In Starkie on Evid., sec. 87, that author, speaking of declarations accompanying an act, says: "These, when the nature and quality of an act are in question, are either to be regarded as part of the act itself, or as the best and most proximate evidence of the nature and quality of the act; their connection with the act either sanctions them as direct evidence, or constitutes them indirect evidence, from which the *real* motive of the actor may be duly estimated." Hence it is that declarations, made by a trader at the time of his departure from his residence or place of business, are evidence of the intention with which he went. His real intention, in such a case, cannot be inferred otherwise than from external appearances—from his acts; and his declarations are collateral indications of the nature of his acts and his intention in doing them. Without further citation of authority, it seems to me to be beyond question that neither the statements of the deceased, nor the so-called Curtis letter were admissible in evidence, especially against the prisoner, whose lips were sealed. They do not furnish the real motive of her leaving Mrs. Dickinson's, and cannot in any proper sense be

said to characterize the act of going. This is not a case where the fact that the declaration was made, *and not its truth or falsity*, is the point in question; it is nothing more than a tissue of falsehoods, evidently concocted for the purpose of affording an excuse for her going to Richmond, and the prisoner should not have been prejudiced by its admission. To such a case every principle which excludes hearsay emphatically applies. The prisoner is not shown at any stage of the proceedings of the lower court to have been connected with it or even to have known of it. The suggestion made in the argument that it was written by her, sent to him, and by him remailed back again, seems to me to be nothing but the baldest conjecture. Looking at it in the light of the use that was made of it by counsel, after its admission as evidence, it is impossible to estimate how seriously the case of the accused was injured by it. Certainly its admission was such an error as entitles him to a reversal of this judgment. *Payne's Case*, 31 Gratt. 855; *Smiths v. Shoemaker*, 17 Wall. 639. This brings me to what I conceive to be the third and last error committed on the trial—namely, the refusal of the court to award the prisoner a new trial.

This is a case of purely circumstantial evidence, and in every such case it is admitted by all the text writers and all the cases, that all the facts and circumstances must be scanned with the closest scrutiny, and that if, upon the whole evidence, there be a reasonable doubt, either as to whether the deceased came to her death by criminal violence or as to who was the criminal agent, that such doubt must be resolved in his favor, and that he is entitled to an acquittal.

Now, with this simple statement of the law, and remembering that the accused cannot be required to make any disproof of the charge made against him until the prosecution has established his guilt, beyond reasonable doubt, by proof both of *the crime* and criminal agent, I ask, is it proven, to the exclusion of every

reasonable doubt, that the accused is a murderer? This, I repeat, is a case of circumstantial evidence, depending not upon the statement of any eye-witness of the occurrence, but depending upon mere inferences to be drawn from facts, few in number, and, to say the least, not closely connected. No one who has not read the record or seen the brief of the State, can begin to appreciate the controlling influence which the mere fact that the prisoner was the supposed seducer of this girl must have exerted over the jury upon the trial of this case. And the real difficulty in establishing that there is a fatal defect of proof as to the cause of the death of the deceased is attributable, not so much to any incriminatory evidence disclosed in the record (for it is certainly meagre and inconclusive) as to the fact that crim-inal intimacy having been once established between the prisoner and the deceased, the natural impulse of those not conversant with criminal cases is to leap to the conclusion that the alleged seducer must, of necessity, be a murderer; and so, it seems to me to be apparent, that the fact that there is no *necessary* or *inevitable* connection between the alleged seduction and death of the deceased has been overlooked. It must be obvious to the humblest understanding that the proper function of this court is not to pass upon the question of the *abstract guilt* of persons charged with offences (for that can be seen alone by the eye of Omniscience), but to determine whether the *legal guilt* if such persons is established.

I have not the time to go into all the details of evidence in this case in order to develop the train of events which led to this poor girl's death, and if I had, I would doubt the wisdom of doing so, as it could only result in casting, perhaps, undeserved suspicion upon the living, without furnishing conclusive evidences of the certainty of my conjectures. I shall therefore only say that I do not feel justified in saying, in the face of the testimony of the medical expert, *that the medical facts are as con-*

*sistent with suicide as a death from violence exerted by another,* that it is not established beyond a doubt that she came to her death by violence.   It is perfectly evident to my mind that undue importance has been attached to the mere motive which the prisoner is supposed to have had to destroy the deceased; indeed, it seem to have been made the hinge upon which this case was made largely to turn in both courts, while no consideration seems to have been given to the powerful inducement this unfortunate girl had to destroy herself or to her declarations that she was anxious to die.   To my mind the motive she had to destroy herself was at least equal to any that the prisoner could have had to make way with her.   But suppose that it be conceded that the death of the deceased was caused by another, still the evidence does not even then establish beyond a doubt that the murderer was the accused. None of the tracks at the reservoir are shown to have been made by the prisoner.   The only witnesses who testify with much distinctness to the character of the tracks left by the male person supposed to have been present at the time of her death, testify, in substance, that the tracks were those of a person wearing a *coarse "broad-bottom shoe"* or *"brogan,"* and the prisoner, although his whereabouts during the whole of the 13th of March are well known, is not shown to have worn such a shoe.   If such had been the case, it seems to me, that it would have been easy for the detective, who is shown to have been so industrious in this case, to have hunted out the evidence of that fact.   The main and, indeed, the only circumstance which tends to show that the accused was with the deceased at the time of her death is the finding (if indeed it was ever lost) of the key, and this certainly is not inconsistent with the hypothesis of innocence.

   Assuming, what is not positively proven, that it was *his* key,

it may have been dropped there by the deceased to whom he may have loaned it, or, it may be, that it was the key which one of the witnesses thinks he saw on her bureau. It is not shown to have been left by any one in flight, for nobody testifies that such tracks, as must inevitably have been left by a person flying, have been found. If I go to the fullest extent which the evidence tends positively to establish, and admit that the man seen with the woman by Dr. Stratton on Reservoir street, on the night of the 13th of March, was the accused, he may yet have left her before she reached the reservoir. The shawl on Dunstan's fence, in my opinion, was never left there by a person who had *already* perpetrated the crime of murder. To my mind it seems improbable that the perpetrator of such a crime would have been carrying around with him and distributing thus the evidence of his guilt. It is certainly far more reasonable to suppose that these articles, which seem to have been dropped at different places, were left by a woman crazed by trouble and anxious to seek, what she foolishly regarded as relief, in death. It is highly probable that this poor girl came to Richmond, after having first communicated her purpose to the accused, to make arrangements for getting rid of the child, with which she was pregnant, or to make arrangements for lying-in; and being foiled in her efforts, sought relief in the waters of the reservoir. Indeed, if we must indulge in conjecture, the mere appearances of a scuffle may have been partly made by one *attempting to withhold* the deceased from drowning herself as well as by one endeavoring to throw her into the reservoir. In any aspect in which we may contemplate the few ascertained facts in this case, they are certainly not absolutely inconsistent with the innocence of the accused of the crime of *murder.* I am therefore constrained to declare that I think the prisoner is clearly entitled to a new trial on each of three grounds, which I have indicated. If time

served I could point to many cases in which this and other courts have taken a like view of cases where the evidence was stronger than it is here; as it is, however, I can only point to *Grayson's Case*, 6 Gratt. and *Smith's Case*, in 21 Gratt. and to remarks of Moncure, P., in *Johnson's Case*, 29 Gratt., in commenting on *Smith's Case*.

JUDGMENT AFFIRMED.